******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ALDIN ASSOCIATES LIMITED PARTNERSHIP
*v.* HESS CORPORATION ET AL.
## (AC 38210)

DiPentima, C. J., and Mullins and Flynn, Js.

*Syllabus*

The plaintiff, a franchisee and owner of four gasoline stations, sought to recover damages from the defendant franchisor, H Co., for violations of the Connecticut Petroleum Product Franchise Act (act) (§ 42-133j et seq.), and the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.), and for breach of the implied covenant of good faith and fair dealing. The plaintiff, which operated the gas stations as H Co.'s franchisee pursuant to written dealer agreements that required the plaintiff to purchase gasoline solely from H Co., alleged in its complaint that H Co. had stifled the plaintiff's ability to compete with other gasoline retail stations, causing it to incur losses in sales volumes and profits, by charging unreasonably high wholesale gasoline prices. Five months after the plaintiff filed a claim for a jury trial, H Co. objected on the ground that the dealer agreements contained express waivers of the plaintiff's right to a jury trial. Approximately one year later, the court conducted an evidentiary hearing and sustained the objection, concluding that the plaintiff had failed to meet its burden of establishing a lack of intent to be bound by the jury trial waivers. A trial to the court commenced approximately two months later, during which the plaintiff argued that it had proved damages based on a summary of operations for its gas stations that listed each station's annual sales volume, profit, and income. The trial court determined that the summary of operations reflected that the plaintiff's profit per gallon during the years in question was less than the eight cents per gallon that H Co. had guaranteed, and, consequently, the plaintiff had sustained a shortfall. The court rendered judgment in favor of H Co. on all counts of the complaint, finding that, even if the issues of liability and causation had been decided in the plaintiff's favor, the plaintiff had not proven damages as to any of its causes of action with a sufficient degree of certainty. On the plaintiff's appeal to this court, *held*:

1. The plaintiff could not prevail on its claim that the trial court improperly sustained H Co.'s objection to its claim for a trial by jury:

    a. It was not clearly erroneous for the trial court to find that the plaintiff had failed to prove, by a preponderance of the evidence, that it did not intend to be bound by the waiver provisions, that court having properly applied the relevant factors and found that the jury trial waiver provisions, which were entered into prior to litigation, were presumptively enforceable: the waivers were not inconspicuously buried in the dealer agreements, the parties' bargaining power was substantially similar, the plaintiff's general partner, who had negotiated and executed the agreements, was a sophisticated business person who made a conscious decision not to retain counsel, and the plaintiff had an opportunity to negotiate the terms of the waiver, and the court's findings with respect to the conspicuousness of the waiver provisions and the equality of the parties' bargaining power were adequately supported by the evidence adduced at the evidentiary hearing and were not clearly erroneous; moreover, although the plaintiff claimed that there was a substantial inequality of bargaining power that weighed against enforcement of the waiver provisions, any pattern of coercive behavior by petroleum product suppliers prior to the enactment of that act had no bearing on whether H Co. engaged in any such conduct in the present case, and the court's finding that the parties enjoyed substantially similar bargaining power during the negotiations of the dealer agreements was not rendered clearly erroneous merely because the waiver provisions were negotiated as part of the franchise agreements.

    b. The jury trial waivers were not void under §§ 42-133*l* and 42-133n of the act, which provide that a franchise agreement cannot waive a franchisee's right to bring an action in Superior Court for a violation of the act; the waivers here did not prevent the plaintiff from bringing an

action against H Co., and, by its express terms, § 42-133n (a) merely secures the right of a franchisee to bring an action for violations of the act and is silent as to the franchisee's right to have that action decided by a jury rather than by a judge.

c. The trial court did not abuse its discretion by failing to overrule H Co.'s objection to the plaintiff's jury trial claim on the ground that the objection was not timely filed, as the plaintiff cited no appellate decision or rule of practice establishing a time limitation on the filing of an objection to a jury trial claim; furthermore, the plaintiff was not unfairly prejudiced with respect to its trial preparation by the timing of H Co.'s objection or the trial court's ruling thereon, as the plaintiff had ample opportunity to obtain an earlier, prompt evidentiary hearing and resolution of the waiver issue, far in advance of the start of trial, but failed to do so.

2. The trial court's finding that the plaintiff had failed to present sufficient evidence to establish its damages with reasonable certainty was clearly erroneous and not supported by the record: for purposes of the counts of the complaint alleging violations of the act and breach of the implied covenant of good faith and fair dealing, the trial court's finding that the plaintiff had not provided the court with the evidence it would need to compute damages was clearly erroneous, as it was inconsistent with the court's prior statement that the plaintiff's summary of operations reflected a certain amount of lost profits, which obligated the court to find that the plaintiff had proven some damages with reasonable certainty, and the court improperly conflated the question of damages with the question of causation, as the reasoning it used plainly hinged on whether the plaintiff's lost profits and sales volumes were caused by H Co.'s allegedly improper conduct, which was an improper basis for concluding that the plaintiff failed to prove damages with reasonable certainty; moreover, the court's finding that the plaintiff's claim under CUTPA failed because it had not presented sufficient evidence of the amount of ascertainable loss was also clearly erroneous, as a loss of customers, even in the absence of an accompanying monetary value of that loss, constitutes an ascertainable loss for purposes of CUTPA, under which the plaintiff was also entitled to claim punitive damages and attorneys' fees, and to have the court exercise its discretion to award such damages.

Argued February 7—officially released September 19, 2017

*Procedural History*

Action to recover damages for, inter alia, the named defendant's alleged violation of the Connecticut Petroleum Product Franchise Act, and for other relief, brought to the Superior Court in the judicial district of Hartford, Complex Litigation Docket, where the complaint was withdrawn as to the defendant A. F. Forbes, Inc.; thereafter, the court, *Miller, J.*, sustained the named defendant's objection to the plaintiff's claim for a jury trial; subsequently, the matter was tried to the court, *Miller, J.*; judgment for the named defendant, from which the plaintiff appealed to this court; thereafter, the court, *Miller J.*, issued an articulation of its decision. *Reversed; further proceedings*.

*Richard P. Weinstein*, with whom, on the brief, were *Dina S. Fisher* and *Sarah Black Lingenheld*, for the appellant (plaintiff).

*Paul D. Sanson*, with whom were *Karen T. Staib* and, on the brief, *Patrick M. Fahey*, for the appellee (named defendant).

*Opinion*

FLYNN, J. The plaintiff franchisee, Aldin Associates Limited Partnership, commenced this three count action against the defendant franchisor, Hess Corporation,[1] alleging that the defendant stifled the plaintiff's ability to compete with other gasoline retail stations, causing it to incur losses in sales volumes and profits, by charging unreasonably high wholesale gasoline prices in violation of the Connecticut Petroleum Product Franchise Act, General Statutes § 42-133j et seq., the implied covenant of good faith and fair dealing, and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. After denying the plaintiff's claim for a trial by jury on the ground that the plaintiff had executed valid written waivers of its right to a jury trial, the trial court conducted a bench trial and rendered judgment for the defendant on all three counts, finding that the plaintiff failed to prove its damages with a sufficient degree of certainty. The plaintiff appeals, claiming that the court (1) improperly denied its claim for a trial by jury, and (2) erroneously found that the plaintiff failed to prove damages as to any of its causes of action with a sufficient degree of certainty. We disagree with the plaintiff's claim with regard to the jury trial waivers, but agree that the court's finding that the plaintiff failed to prove damages with the requisite degree of certainty was clearly erroneous. Accordingly, we reverse the judgment of the trial court and remand the case for further proceedings.

The following facts, which are either undisputed or were found by the trial court in its memorandum of decision, and procedural history are relevant to this appeal. The plaintiff acquired three gas stations in August, 2000, and a fourth in December, 2002.[2] The plaintiff operated them as the defendant's franchisee pursuant to written agreements entitled "Dealer Agreement Gasoline Station" (dealer agreements). Each dealer agreement[3] required the plaintiff to purchase gasoline and other products exclusively from the defendant, to be resold by the plaintiff at retail prices. With respect to the defendant's pricing of wholesale gasoline—a hotly contested issue throughout this case—the dealer agreements required the defendant to sell gasoline to the plaintiff at "dealer tankwagon prices," which were to be determined by the defendant on the basis of the prices of competitors in the marketing area of each station at the time of delivery. Each of the dealer agreements also contained a clause providing that the parties "waive any right they may have to a jury trial in any disputes hereunder."

The plaintiff commenced this lawsuit in December, 2010, alleging that, around 2005, the defendant began charging dealer tankwagon prices that were arbitrary, unreasonable, and substantially more expensive than the wholesale gasoline prices it was charging to the

plaintiff's competitors. The plaintiff asserted that the increases to dealer tankwagon prices put each of its four stations at a substantial competitive disadvantage because, with higher wholesale prices, the stations could no longer profitably charge retail prices that were cheap enough relative to their competitors' prices to attract customers. The improper pricing, the plaintiff asserted, caused it to incur losses in sales volumes and profits. The plaintiff's three count amended complaint alleged that the defendant's conduct violated several provisions of the Connecticut Petroleum Product Franchise Act, specifically, General Statutes § 42-133*l* (f) (5), (6), and (7),[4] the implied covenant of good faith and fair dealing, and CUTPA.

On April 11, 2011, the plaintiff filed a claim for a trial by jury. The defendant objected on the ground that the dealer agreements contained express waivers of the plaintiff's right to a jury trial and that, pursuant to *L & R Realty* v. *Connecticut National Bank*, 246 Conn. 1, 16, 715 A.2d 748 (1998), such waivers are presumptively valid. The court held an evidentiary hearing on October 16, 2012, and found that the plaintiff had failed to carry its burden of proving that the waivers were unenforceable. Accordingly, the court sustained the defendant's objection to the plaintiff's request for a trial by jury and denied the plaintiff's subsequent motion for reconsideration.

The court conducted a bench trial that commenced on December 11, 2012, and concluded on December 10, 2013. Following the parties' submissions of posttrial briefs and proposed findings of fact, the court issued a memorandum of decision on July 20, 2015, finding for the defendant on all counts of the complaint. Specifically, the court found that the plaintiff failed to prove damages with a sufficient degree of certainty. The court rendered a judgment in accordance with that decision, and this appeal followed. Additional facts and procedural history will be set forth where necessary.

I

We first address the plaintiff's claim that the court improperly sustained the defendant's objection to its claim for a jury trial. In support of this claim, the plaintiff argues that (1) the court erroneously concluded, on the basis of the evidence adduced at the October 16, 2012 evidentiary hearing, that the plaintiff failed to demonstrate that it did not intend to waive its jury trial rights, (2) the express jury trial waivers in the dealer agreements were void as a matter of law under § 42-133*l* (j),[5] and (3) the court abused its discretion by failing to deny the defendant's objection to the jury trial claim on grounds of untimeliness. We address these arguments in turn.

A

The plaintiff first argues that the court erred in finding

that it failed to carry its burden of demonstrating that it did not intend to be bound by the jury trial waiver provisions. We disagree.

Section 31 of each dealer agreement, entitled "Venue" and located on the last page just the parties' signature lines, provides as follows: "The rights of the parties under this Agreement will be governed by the federal law of the district in which the Station is located. All disputes will be heard in the U.S. District Court and the prevailing party will be entitled to recover its attorneys' fees from the other party. *Both parties waive any right they may have to a jury trial in any disputes hereunder.*"[6] (Emphasis added.)

On April 11, 2011, the plaintiff filed a claim for a trial by jury. The defendant filed an objection asserting that, on the basis of § 31 of the dealer agreements, the plaintiff waived its right to a trial by jury. In a "supplemental reply" dated October 3, 2012, the plaintiff argued that, on the basis of the factors set forth in *L & R Realty* v. *Connecticut National Bank*, supra, 246 Conn. 15, the jury trial waivers were unenforceable because they were not executed knowingly and voluntarily. In support of this argument, the plaintiff submitted an affidavit from David Savin, the plaintiff's general partner who negotiated and executed the dealer agreements, wherein Savin averred that he "did not review the so-called venue paragraph and was not aware of the jury trial waiver," that the plaintiff "was not represented by an attorney to review the agreements," that the plaintiff "did not negotiate any terms of the agreements,"[7] and that he "executed the agreements as they were presented . . . without changes and without any discussion as to the language in the agreements." The plaintiff asserted that an evidentiary hearing was necessary to resolve the issue of whether the waivers were executed knowingly and voluntarily.

The court conducted an evidentiary hearing on October 16, 2012, at which Savin testified for the plaintiff and Michael McAfee, the defendant's manager of retail administration, testified for the defendant. Ruling from the bench, the court sustained the defendant's objection to the jury trial claim. Relying on the *L & R Realty* factors, the court concluded that express contractual jury trial waivers like the ones at issue in the present case are "presumptively enforceable," and that "[t]he evidence . . . has not established any reason why th[e] waiver[s] should not be enforced." In support of this conclusion, the court found: "The waiver[s] . . . [were] not buried in the [dealer] agreement[s]. [They weren't] as conspicuous as everyone might like, but [they are] not buried. [They weren't] designed to be hidden. In any event, it is important to remember that [these were] commercial contract[s] between two parties. I'm not going to say [that the parties] were of exactly equal bargaining power, but they were in sub-

stantially similar bargaining power. Neither one was in a position to claim that it could be disadvantaged by the other.

"It's clear that . . . Savin didn't have counsel to review the agreement[s], but that was his choice. . . . I think that [Savin has] more experience reading contracts than most attorneys do in all probability. But there was a conscious decision made by a sophisticated business person not to have counsel review the document[s].

"There is no other evidence which indicates a lack of intent by either party to be bound by this waiver. The evidence that there [were] negotiations between the parties to the dealer agreement[s] . . . supports the defendant, not the plaintiff. If the plaintiff had a problem with the jury trial waiver[s], [they] might well have been negotiated. In any event, other things in the contract were negotiated. [The waivers] could have been negotiated." Accordingly, the court sustained the defendant's objection to the plaintiff's claim for a trial by jury and ordered the case to be tried before the court.

The plaintiff claims that the court erred in concluding that it failed to meet its burden of establishing its lack of intent to be bound by the jury trial waiver provisions. Specifically, the plaintiff argues that the waivers are inconspicuous because they are located within paragraphs misleadingly entitled "Venue," are not in bold lettering or a different typeface, and generally fail to "call attention to the fact that the paragraph contains a waiver of a constitutional right." The plaintiff also appears to assert that, because the Connecticut Petroleum Product Franchise Act was enacted for the purpose of preventing franchisees from being coerced during contract negotiations by franchisors, the defendant, as the franchisor, had substantially more bargaining power during contract negotiations. We are not persuaded.

"[W]hether a party has waived his right to a jury trial presents a question of fact for the trial court," and our review is limited to whether the finding was clearly erroneous.[8] (Internal quotation marks omitted.) *L & R Realty* v. *Connecticut National Bank*, supra, 246 Conn. 8; see also *Perricone* v. *Perricone*, 292 Conn. 187, 208–209, 972 A.2d 666 (2009). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *L & R Realty* v. *Connecticut National Bank*, supra, 8–9.

"The constitution of Connecticut, article first, § 19, provides that [t]he right of trial by jury shall remain inviolate. That provision guarantees the right to a jury trial in all cases for which such a right existed at the time of the adoption of that constitutional provision

in 1818."[9] (Internal quotation marks omitted.) Id., 9. Ordinarily, although the right to a jury trial may be waived, a waiver cannot be inferred without "reasonably clear evidence of the intent to waive." (Internal quotation marks omitted.) Id., 10. Our Supreme Court has identified the following factors that, generally speaking, bear on the determination of whether a party intended to waive their right to a jury trial: "(1) the conspicuousness of the waiver clause, including (a) its location relative to the signatures of the parties, (b) whether it was buried in the middle of a lengthy agreement, and (c) whether it was printed in a different typeface or font size than the remainder of the contract; (2) whether there was a substantial disparity in bargaining power between the parties to the agreement; (3) whether the party seeking to avoid enforcement was represented by counsel; (4) whether the opposing party had an opportunity to negotiate the terms of the agreement; and (5) whether the opposing party had been fraudulently induced into agreeing specifically to the jury trial waiver." Id., 15.

Because the jury trial waiver provisions at issue in the present case were executed by the parties prior to litigation as part of the dealer agreements, the burden was on the plaintiff to establish that it did not intend to waive its right to a jury trial. "[E]xpress commercial contractual jury trial waivers entered into prior to litigation are presumptively enforceable. In order to rebut this presumption, the party seeking to avoid the waiver must come forward with evidence that it clearly did not intend to waive the right to a jury trial. Such evidence may be apparent on the face of the agreement, such as where the waiver is in particularly fine print or is buried in the middle of a voluminous document. In addition, the party seeking to avoid enforcement may come forward with evidence that there was an inequality of bargaining power, that he or she was not represented by counsel, or other evidence indicating a lack of intent to be bound by the waiver provision. Once the party seeking to invalidate the waiver has come forward with such evidence, the trial court must hold a hearing at which additional evidence may be received. At this hearing, the party seeking to avoid the waiver carries the burden of proving, by a preponderance of the evidence, the lack of a clear intent to be bound by the waiver provision." Id., 16. The plaintiff therefore bore the burden in this case before the trial court. On appeal, we conclude that the plaintiff has not carried its burden of demonstrating that the court clearly erred in finding that the plaintiff failed to prove its lack of intent to be bound by the jury trial waivers.

The court's decision reflects a proper application of the factors set forth in *L & R Realty*. Specifically, the court found: (1) that the waiver provisions were "not buried in the [dealer] agreements"; (2) that the parties' bargaining power was "substantially similar," albeit not

"exactly equal"; (3) that, although Savin did not have an attorney review the dealer agreements, that fact did not militate in favor of avoiding the waiver provisions because Savin was "a sophisticated business person" who made a conscious decision not to retain counsel; and (4) that, because other provisions of the dealer agreements were negotiated, had the plaintiff had "a problem with the jury trial waiver[s], [they] might well have been negotiated."

The plaintiff appears to challenge the court's findings only with regard to the conspicuousness of the jury trial waiver provisions and the equality of the parties' bargaining power. Both findings, however, are supported adequately by the evidence adduced at the October 16, 2012 evidentiary hearing and, therefore, not clearly erroneous. First, although the paragraph that contains the waiver provision in each of the dealer agreements is labeled with the term "Venue," rather than with an explicit reference to the right to a trial by jury, the waiver provisions were not inconspicuous. In each of the four dealer agreements, all of which were executed by Savin, the waiver provisions are located on the last page just above the parties' signature lines and consist of three short sentences, the last of which states in no uncertain terms that "[b]oth parties waive any right they may have to a jury trial in any disputes" arising under the dealer agreements. Therefore, regardless of the length of the dealer agreements, the waiver provisions were not "buried in the middle" of them; *L & R Realty* v. *Connecticut National Bank*, supra, 246 Conn. 15; as the plaintiff contends.

The court's finding that the parties enjoyed "substantially similar" bargaining power also finds adequate support in the record. The plaintiff, although considerably smaller than the defendant, is a large company in its own right with substantial assets and sales revenues. Savin testified, for example, that from 2005 through 2011, the plaintiff generated annual revenues of between $150 million and $200 million. Savin and McAfee also both testified, and the court found, that the plaintiff had an opportunity to negotiate, and successfully did negotiate, other provisions of the dealer agreements, which not only demonstrates that the plaintiff possessed at least some level of bargaining power during contract negotiations, but also suggests that its failure to negotiate the waiver provisions was a product of its assent to be bound by them.

The plaintiff appears to suggest that there was a substantial inequality of bargaining power, weighing against enforcement of the waiver provisions, because the waivers were contained within petroleum product franchise contracts and such contracts inherently present "coercive opportunities" for franchisors such as the defendant. As evidence for this proposition, the plaintiff argues that our legislature's enactment of the

Connecticut Petroleum Product Franchise Act demonstrates the coercive nature of petroleum product franchise contracts. It is true that the Connecticut Petroleum Product Franchise Act was enacted in part "to avoid undue control of the [petroleum] dealer by suppliers . . . and to offset evident abuses within the petroleum industry as a result of inequitable economic power . . . ." General Statutes § 42-133j (a). Any pattern of coercive behavior by petroleum product franchisors prior to the enactment of the Connecticut Petroleum Product Franchise Act, however, says nothing about whether *the defendant* engaged in any such conduct *in the present case.* As previously stated, the court found that the parties enjoyed "substantially similar" bargaining power during negotiations of the dealer agreements. That finding is adequately supported by the record and is not rendered clearly erroneous merely because the waiver provisions were negotiated as part of franchise agreements. The purpose underlying the enactment of the Connecticut Petroleum Product Franchise Act does not alter the result of our application of the *L & R Realty* factors.

Moreover, although it did not explicitly form any part of the court's analysis, we note that the plaintiff does not dispute that the jury trial waiver provisions were contained in all four of the dealer agreements, and that the plaintiff renewed each of the dealer agreements multiple times after they initially were executed. Savin also admitted that he was given an opportunity to review the agreements before signing them. Put simply, the record shows that Savin had ample opportunity to object to the waiver provisions.

Accordingly, the record provides ample support for the court's finding that the plaintiff failed to prove by a preponderance of the evidence that it did not intend to be bound by the waiver provisions, and we are not left with a definite and firm conviction that a mistake has been made.

B

The plaintiff next contends that the jury trial waiver provisions are void as a matter of law pursuant to §§ 42-133*l* (j) and 42-133n. Section 42-133*l* (j) provides: "Any waiver of the rights of a franchisee under sections 42-133m, 42-133n and this section which is contained in any franchise agreement entered into or amended on or after October 1, 1977, shall be void." Section § 42-133n (a) provides in relevant part that "[a]ny franchisee may bring an action for violation of sections 42-133*l* or 42-133m in the Superior Court to recover damages sustained by reason of such violation . . . ." The plaintiff argues that the jury trial waivers effectively prevented it from exercising its right, guaranteed under § 42-133n (a), to bring an action against the defendant for damages for violations of the Connecticut Petroleum Product Franchise Act, and, therefore, is void under

§ 42-133*l* (j). We disagree. By its express terms, § 42-133n (a) merely secures the right of a franchisee to "bring an action" for violations of the Connecticut Petroleum Product Franchise Act; it says nothing of a franchisee's right to have that action decided by a jury rather than a judge. The jury trial waivers do not prevent the plaintiff from bringing an action against the defendant for violations of the Connecticut Petroleum Product Franchise Act. Therefore, § 42-133*l* (j) does not bar the plaintiff from relinquishing its right to a jury trial.

C

Finally, the plaintiff contends that the court abused its discretion by failing to overrule the defendant's objection to the jury trial claim on the ground that the objection was not timely filed and by delaying its ruling on the issue "until immediately before jury selection was to begin." The plaintiff asserts that the court's last minute ruling "caused [it] unfair prejudice and lost time preparing the case for a jury trial." We are not persuaded.

We review the court's failure to overrule the defendant's objection on grounds of untimeliness and unfair prejudice only for an abuse of discretion. This is because such a decision implicates interests of "judicial economy, docket management or courtroom proceedings," considerations that are "particularly within the province of the trial court" to weigh. (Internal quotation marks omitted.) *Kelly* v. *Kelly*, 85 Conn. App. 794, 800, 859 A.2d 60 (2004); see also *West Haven Lumber Co.* v. *Sentry Construction Corp.*, 117 Conn. App. 465, 469–70, 979 A.2d 591 (trial court entitled to broad discretion in discharging its "responsibility to avoid unnecessary interruptions, to maintain the orderly procedure of the court docket, and to prevent any interferences with the fair administration of justice" [internal quotation marks omitted]), cert. denied, 294 Conn. 919, 984 A.2d 70 (2009). "A reviewing court is bound by the principle that [e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made." (Internal quotation marks omitted.) *West Haven Lumber Co.* v. *Sentry Construction Corp.*, supra, 470.

We discern no abuse of discretion on the part of the trial court. As to the timeliness of the defendant's objection, the plaintiff filed its claim for a trial by jury on April 11, 2011, and the defendant filed its objection slightly more than five months later on September 16, 2011. The plaintiff has cited no appellate decision or rule of practice establishing a time limitation on the filing of an objection to a jury trial claim, and this court is not aware of any.

In any case, we disagree that the plaintiff has been unfairly prejudiced by the timing of either the defendant's objection or the court's ruling. To the extent that the claimed delays have caused the plaintiff to "los[e]

time preparing the case for a jury trial," we conclude that neither the defendant nor the trial court bear responsibility for that hardship. At the time the defendant initially filed its objection to the jury trial claim on September 16, 2011, no trial date had been scheduled. The plaintiff filed a "reply" a few days later, raising multiple arguments in opposition to the defendant's objection. The plaintiff neglected, however, to raise any argument in its reply as to the enforceability of the waiver provisions pursuant to *L & R Realty*, or to request an evidentiary hearing on the matter. Instead, almost a full year passed without the plaintiff filing a motion for argument or otherwise affirmatively attempting to obtain a timely ruling on the issue. See General Statutes § 51-183b; Practice Book § 11-19. On October 3, 2012, shortly before the start of trial, the plaintiff filed a "supplemental reply" asserting "additional reasons why the defendant's objection cannot be sustained," including that the waivers were not executed knowingly and intelligently. The plaintiff requested an evidentiary hearing pursuant to *L & R Realty* to resolve that issue.[10] Accordingly, the plaintiff had ample opportunity to obtain an earlier, prompt evidentiary hearing and resolution of the waiver issue, far in advance of the start of trial. We therefore conclude that the court did not prejudice the plaintiff's trial preparation by the way in which it dealt with the defendant's objection to the plaintiff's claim for a jury trial.

II

The plaintiff next claims that the court erroneously concluded that it failed to prove its damages with the requisite degree of certainty. We agree.

As previously set forth, the plaintiff's operative complaint alleges causes of action for violations of the Connecticut Petroleum Product Franchise Act, the covenant of good faith and fair dealing, and CUTPA, each of which stems from the defendant's allegedly improper pricing of dealer tankwagon rates. The dealer agreements required the defendant to sell the plaintiff wholesale gasoline at the defendant's "dealer tankwagon prices in the marketing area of the Station, as determined by [the defendant], for the grades and quantities delivered, in effect at the time of delivery . . . ." The dealer agreements provided no further definition of dealer tankwagon price.

Following the conclusion of the bench trial on December 10, 2013, the plaintiff submitted proposed findings of fact setting forth its theories of liability and damages. Citing the evidence admitted at trial, the plaintiff urged the court to find that, while negotiating the dealer agreements, the defendant represented that it would calculate the dealer tankwagon prices using a method known as "street back pricing." This method, the plaintiff asserted, required the defendant to regularly consider surveys listing the retail gasoline prices

that competing dealers were charging in the market areas of each of the plaintiff's four stations. The defendant would then charge the plaintiff a dealer tankwagon price cheap enough to allow it to maintain retail prices at the bottom of the market for each location, enabling the plaintiff to turn a profit of eight cents per gallon of gasoline sold.[11] The plaintiff further contended that, around 2005, after a few years of this course of dealing, the defendant abandoned the "street back pricing" method and began charging dealer tankwagon prices that were arbitrary and unreasonable, as evidenced by the fact that the defendant's dealer tankwagon prices increased while retail prices being charged by the plaintiff's competitors remained relatively constant. The plaintiff further asserted that, as a result of these price increases, it was required to raise its retail prices, which inhibited its ability to attract customers and caused it to experience a drop in profits and overall sales volumes.

To prove damages, the plaintiff relied primarily on two documents—a "summary of operations," which listed each station's annual sales volume, profit, and income from 2001 through 2011, and a "damage analysis," which concluded that the defendant's improper pricing of dealer tankwagon rates caused it to incur $2,784,000 in damages from 2005 through 2011. To arrive at that number, the plaintiff subtracted its annual income from 2005 through 2011 from $603,000, which was the plaintiff's approximate average annual income in 2003 and 2004,[12] before the defendant allegedly had begun to improperly price its dealer tankwagon charges.[13] The plaintiff asserted that the apporixmate sum of those differences—$2,784,000—reflects the additional income that it *would have generated* from 2005 through 2011 had the defendant charged reasonable dealer tankwagon prices throughout that time.

The court issued a memorandum of decision on July 20, 2015, finding for the defendant on all three counts of the operative complaint. At the outset, the court stated that it was opting to decide the case on the "issue of whether the plaintiff has proven its claim for damages well enough for the court to award them, if [the court] found for the plaintiff on one or more of the issues regarding liability." After briefly reciting the historical facts of the case, including the parties' disputes regarding the proper method for determining dealer tankwagon prices and whether the defendant, in fact, had guaranteed the plaintiff a profit of eight cents per gallon, the court stated that the plaintiff's summary of operations was "by far the single most important evidence presented in this case," and noted that the defendant did not dispute the accuracy of the numbers contained therein. The court found that the summary of operations reflected certain "critical facts," including the number of gallons of gasoline sold by the plaintiff from 2001 to 2011 and that the plaintiff's overall average profit per gallon over that period was less than the allegedly guar-

anteed eight cent profit margin. The court used those figures to determine that from 2001 to 2011 the plaintiff had a "hardly substantial" "shortfall" of $452,777.34.

The court stated that these figures "show[ed] the plaintiff's allegations of 'price gouging' in a much different light" because, from 2001 through 2011, the plaintiff "was . . . getting its eight cent [profit per gallon] or a number very close to it." The court then explained that the plaintiff's complaints over the defendant's determination of dealer tankwagon prices were based upon the plaintiff's belief that the defendant "was keeping it from making something more than the eight cents per gallon that it claims it was guaranteed." The court then found: "Even if the plaintiff could convince the court that [the defendant] had overcharged it for gasoline and thereby caused [the plaintiff] to lose money, the plaintiff simply has not provided the court with the evidence it would need to compute such damages."

The court then observed that, for at least two reasons, the plaintiff failed to prove that the defendant "caused . . . losses which could be determined with reasonable certainty . . . ." First, the court reasoned that the plaintiff's four stations "offer[ed] . . . potential customers a low price per gallon but not much else," which meant that, although the plaintiff might lose business when its retail prices increase, "it will also lose business to customers who need a gas station with a rest room or one of any number of other amenities, regardless of the price . . . ." This dynamic, the court stated, "would obviously be hard to measure . . . ." Second, the court posited that competing retailers frequently offer generous price discounts to customers, and that the plaintiff's stations "are not likely to compete successfully with stations [that] can give a customer [thirty cents] per gallon or more off the price of a tank of gas." The court stated that, although other examples abound, "the point is clear: [P]rice is very important and [the plaintiff] often still won't be able to compete on price with some stations [that] can give buyers price and other things they want."

The court further observed that, although "[t]here may be ways to measure the extent to which a gas retailer can lose money despite a low price . . . the plaintiff has not given any such information to the court. Similarly, a gas station which suddenly obtains the ability to charge significantly less for the same product may not see an equivalent increase in sales because of the price drop. There may be something else about the station which makes drivers not want to go there so much that they will forgo some potential savings in order to fill their gas tanks somewhere else." Accordingly, the court found that it "could not evaluate the plaintiff's claimed damages accurately enough to award damages to the plaintiff, if it found in favor of the plaintiff."

The defendant thereafter filed a motion for articulation, seeking clarification on the following question: "In concluding that [the plaintiff] had failed to prove its claim for damages, did the . . . court determine [that the] plaintiff had failed to demonstrate causation . . . in that the plaintiff failed to prove that [the defendant's] actions caused the plaintiff's asserted decline in profitability?" The defendant argued that the court's analysis was "arguably ambiguous" because, while purporting to resolve the case solely on the basis of damages, it also included findings that related to the element of causation, particularly the two examples of other factors that potentially could have impacted the profitability of the plaintiff's four gas stations. In response to the defendant's motion for articulation, the court stated: "The short answer to [the defendant's] question [of whether the court had determined that the plaintiff failed to prove causation] is 'no.' This court found for the [defendant] because . . . the plaintiff had not presented enough evidence on damages to allow the court to award them, even if the court had decided the issues of liability and causation in the plaintiff's favor."

On appeal, the plaintiff claims that the court improperly found that the evidence adduced at trial was insufficient to establish its damages with the requisite degree of certainty. The plaintiff asserts that the summary of operations document, the accuracy of which was not disputed at trial, reflects with sufficient precision the decreases in profits and overall sales volumes it began experiencing in 2005 when the defendant started improperly pricing dealer tankwagon charges. Indeed, the plaintiff notes that the court specifically found in its memorandum of decision that the summary of operations demonstrated that the plaintiff suffered a "shortfall" of $452,777.34 in profits from between 2001 and 2011. The plaintiff asserts that this finding alone, despite being based on incorrect math and a misunderstanding of its theory of damages,[14] demonstrates that "at least some" of its claimed damages could be calculated with reasonable certainty and requires a reversal of the court's judgment. (Emphasis omitted.) We agree and conclude that the court clearly erred (1) in finding that the plaintiff failed to establish damages with reasonable certainty for purposes of the counts alleging violations of the Connecticut Petroleum Product Franchise Act and covenant of good faith and fair dealing, and (2) in finding that the plaintiff failed to establish an ascertainable loss for purposes of CUTPA.

A

We begin by addressing the plaintiff's claim that the court improperly found that it failed to prove damages with the requisite degree of certainty for purposes of its claims alleging violations of the Connecticut Petroleum Product Franchise Act and the covenant of good faith and fair dealing.[15]

"The legal principles that govern our review of damage awards are well established. It is axiomatic that the burden of proving damages is on the party claiming them. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty. . . . [T]he court must have evidence by which it can calculate the damages, which is not merely subjective or speculative . . . but which allows for some objective ascertainment of the amount. . . . This certainly does not mean that mathematical exactitude is a precondition to an award of damages, but we do require that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation [that] will enable the trier to make a fair and reasonable estimate. . . . Evidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion. . . . The trial court's determination that damages have not been proved to a reasonable certainty is reviewed under a clearly erroneous standard." (Citations omitted; internal quotation marks omitted.) *Weiss* v. *Smulders*, 313 Conn. 227, 253–54, 96 A.3d 1175 (2014).

"[W]hether the decision of the trial court is clearly erroneous . . . involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled." (Internal quotation marks omitted.) *Gianetti* v. *Norwalk Hospital*, 304 Conn. 754, 780, 43 A.3d 567 (2012). Moreover, we do not "examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported." (Internal quotation marks omitted.) *Chebro* v. *Audette*, 138 Conn. App. 278, 284, 50 A.3d 978 (2012).

In the present case, we conclude that the court's finding that the plaintiff failed to present sufficient evidence to establish its damages with reasonable certainty was clearly erroneous. In its memorandum of decision, the court stated that the plaintiff's complaints about the dealer tankwagon prices were based upon

the plaintiff's belief that the price increases were preventing it from realizing a profit of eight cents per gallon. Crediting the plaintiff's summary of operations, which was not disputed in terms of its mathematical accuracy, the court found that, from 2001 through 2011, the plaintiff's average profit was less than the allegedly guaranteed eight cents, resulting in a "shortfall" of $452,777.34 over that period. Thus, the court was able to determine, on the basis of the plaintiff's theory of liability and damages as the court understood them to be, the lost profits that the plaintiff incurred.[16] Having made that finding, we conclude that the court was obligated to find that, at the very least, the plaintiff had proven $452,777.34 of its damages with reasonable certainty. "Damages are recoverable . . . *to the extent that* the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Emphasis added; internal quotation marks omitted.) *Weiss* v. *Smulders*, supra, 313 Conn. 253–54. Despite this finding, however, the court concluded that, "[e]ven if the plaintiff could convince the court that [the defendant] overcharged it for gasoline and thereby caused [the plaintiff] to lose money, the plaintiff simply has not provided the court with the evidence it would need to compute such damages." Because this conclusion cannot be reconciled or found consistent with the court's prior statement that the plaintiff's summary of operations reflected losses in profits of $452,777.34, it is not legally and logically supported by the record and, consequently, it is clearly erroneous.[17]

Moreover, in concluding that the plaintiff failed to adduce sufficient evidence of damages, the court improperly conflated the question of damages with the question of causation. The clearly erroneous standard requires the reviewing court to "focus on the conclusion of the trial court, *as well as the method by which it arrived at that conclusion*, to determine whether it is legally correct and factually supported." (Emphasis added; internal quotation marks omitted.) *Chebro* v. *Audette*, supra, 138 Conn. App. 284. Critically, the court explicitly stated that its decision was based solely on the plaintiff's failure to prove damages with reasonable certainty, and that it had assumed, arguendo, that the plaintiff had proven the elements of liability and causation. Indeed, in response to the defendant's motion for articulation, in which the defendant acknowledged that the court's analysis also included findings relevant to the element of causation, the court reiterated that its decision only included findings on the issue of damages and that it had assumed for purposes of argument that the plaintiff had proven "the issues of liability and causation . . . ."

Despite disclaiming any findings relevant to causation, however, the court's reasoning plainly hinged not on whether the plaintiff had presented evidence from which its damages could be calculated with reasonable

certainty, as is the sole question in a strict damages analysis, but on whether the plaintiff's losses in profits and sales volumes were *caused* by the defendant's alleged improper conduct as opposed to some other factor. For instance, the court stated that the plaintiff "has not met its burden to prove that the defendant *caused* it losses which could be determined with reasonable certainty," and then posited two reasons for this: (1) that it was "hard to measure" which of the plaintiff's customers were lost as a result of the defendant's pricing as opposed to the plaintiff's lack of amenities or other attractive features, and (2) that the plaintiff's stations are "not likely to compete" with other stations offering loyalty programs and attractive discounts. (Emphasis added.) The court concluded that "[t]here may be something else about the station which makes drivers not want to go there so much that they will forgo some potential savings in order to fill their tanks somewhere else."

These factors are relevant only to the question of causation, and, therefore, are improper bases for concluding that the plaintiff failed to proffer evidence upon which its damages could be calculated with reasonable certainty. To be sure, courts have at times treated the damages element as *encompassing* a causation requirement, rather than analyzing damages and causation as distinct elements. In breach of contract cases, for instance, "[a]lthough this court has intimated that causation is an additional element [of a breach of contract action] . . . proof of causation more properly is classified as part and parcel of a party's claim for . . . damages." (Citation omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, 149 Conn. App. 177, 186, 90 A.3d 219 (2014); see also *Neiditz* v. *Morton S. Fine & Associates, Inc.*, 199 Conn. 683, 689 n.3, 508 A.2d 438 (1986) (observing that, in tort action, "the plaintiffs are entitled to recover all damages *proximately caused* by the defendant's negligent performance of the contract" [emphasis added]).

Indeed, the plaintiff's causes of action for violations of the Connecticut Petroleum Product Franchise Act and covenant of good faith and fair dealing are no different—both require proof of some causal relationship between the plaintiff's losses and the defendant's alleged misconduct. See General Statutes § 42-133n (a) (providing that "[a]ny franchisee may bring an action for violation of [the Connecticut Petroleum Product Franchise Act] . . . to recover damages sustained *by reason of* such violation" [emphasis added]); *Pikulski* v. *Waterbury Hospital Health Center*, 269 Conn. 1, 7 n.4, 848 A.2d 373 (2004) ("[i]t is axiomatic . . . that in every tort action, the fact finder may award economic damages only if the plaintiff has proven those damages to a reasonable certainty *and has shown that the defendant had proximately caused the damages*" [emphasis added; internal quotation marks omitted]). Yet, even if causation properly is considered to be part

of the damages analysis in a particular case, the court in the present case removed causation from the equation by explicitly indicating in its memorandum of decision, and again in its response to the defendant's motion for articulation, that it was not issuing a finding on causation and, indeed, that it had assumed, for purposes of its analysis, that causation had been proven. Because causation explicitly formed no part of the court's decision, we conclude that the court reached its determination that the plaintiff failed to provide the court with a reasonable basis for calculating damages only by improperly conflating that issue with the question of causation. Accordingly, the court's finding with regard to the calculability of the plaintiff's damages was clearly erroneous.

The defendant argues that the plaintiff's damages theory was fatally speculative because the plaintiff was required "to prove that the lost profits to which it claims to be entitled resulted from [the defendant's] allegedly unfair pricing *and no other market factors*," and failed to do so. (Emphasis in original.) The defendant then lists a multitude of market factors that, it asserts, the plaintiff failed to eliminate as potential causes of its losses in profits and sales volumes. Again, these arguments relate to the question of causation, not damages, and the court explicitly stated both that it had not issued findings relevant to causation, and that its decision was predicated on the assumption that causation had been proven. Affirming the court's decision on this basis effectively would require us to find facts that the court explicitly declined to find. "It is well settled that this court cannot find facts, nor, in the first instance, draw conclusions of facts from primary facts found, but can only review such findings to see whether they might legally, logically and reasonably be found." (Internal quotation marks omitted.) *Appliances, Inc.* v. *Yost*, 186 Conn. 673, 676–77, 443 A.2d 486 (1982); see also *New England Custom Concrete, LLC* v. *Carbone*, 102 Conn. App. 652, 661, 927 A.2d 333 (2007). Fidelity to this principle requires us to avoid delving into whether other market factors could have caused the plaintiff's losses. Instead, we must assume, as the trial court did, that causation had been proven, and confine our inquiry to the narrow question of whether the plaintiff adduced evidence upon which its damages could be calculated with reasonable certainty.

Finally, the defendant argues that, although the plaintiff presented evidence of what the defendant *actually* charged in terms of dealer tankwagon prices, it failed to present evidence of what the defendant reasonably *should have charged*. This additional variable, the defendant asserts, is essential for an adequate damages calculation. Even if we were to agree that the plaintiff failed to present evidence of what a proper dealer tankwagon price would have been, the result of our analysis would remain the same. We reiterate that "mathemati-

cal exactitude is [not] a precondition to an award of damages . . . ." (Internal quotation marks omitted.) *Weiss* v. *Smulders*, supra, 313 Conn. 254. Instead, we merely "require that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation [that] will enable the trier to make a fair and reasonable estimate." (Internal quotation marks omitted.) Id. Because, as we have stated, the court could not have concluded reasonably that the plaintiff's evidence failed to meet this standard, the court's finding with regard to damages was clearly erroneous.

B

The plaintiff's CUTPA claim is particularly unsuited to be decided at trial solely on the basis of whether it adequately had proved the amount of its claimed damages, assuming that liability and causation had been proved. The court ruled against the plaintiff's claim that the defendant's 2005 change in its course of dealing with the plaintiff with respect to its method of calculating the dealer tankwagon prices was an unfair trade practice in violation of CUTPA because the plaintiff had not proved damages.

The court specifically stated in both its memorandum of decision and in response to the defendant's motion for articulation that it was not deciding causation issues. To decide the plaintiff's CUTPA claim, however, the court necessarily had to first decide a causation issue, namely, whether the defendant had improperly caused the plaintiff to lose customers by changing its method of calculation of dealer tankwagon prices, and that this change constituted an unfair trade practice under § 42-110g (a).

Leaving aside for the moment the court's finding that there had been a "shortfall" of $452,777.34 in what the plaintiff might otherwise have expected to generate in profits, the plaintiff was entitled to claim punitive damages and attorney's fees under CUTPA even if it had not proved a fixed amount of ascertainable dollar loss. "[Section] 42-110g (a) affords a cause of action to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . . [L]oss has a broader meaning than the term damage. . . . As a consequence, [u]nder CUTPA, there is no need to allege or prove the amount of the ascertainable loss. . . . The plaintiff's failure adequately to prove damages, therefore, does not dispose of the CUTPA claim." (Citations omitted; internal quotation marks omitted.) *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 78–79, 717 A.2d 724 (1998), quoting *Catucci* v. *Ouellette*, 25 Conn. App. 56, 60, 592 A.2d 962 (1991), and *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 614, 440 A.2d 810 (1981).

The plaintiff's summary of operations, which the court credited at trial, showed that the plaintiff began to experience a decrease in sales volumes around 2005 at the time the defendant allegedly had begun pricing dealer tankwagon charges without use of what the plaintiff termed "street back pricing" that had been in effect for several years. Volume of sales of gasoline in a retail gasoline station is dependent on the number of gasoline customers who purchase gasoline for their vehicles at that station. Because a loss of customers, even in the absence of an accompanying monetary value of that loss, constitutes an ascertainable loss for purposes of CUTPA; see *Service Road Corp.* v. *Quinn*, 241 Conn. 630, 643–44, 698 A.2d 258 (1997); the court's finding that the CUTPA claim failed because the plaintiff failed to present sufficient evidence of the amount of an ascertainable loss was clearly erroneous.

Furthermore, a plaintiff who brings a cause of action alleging an unfair trade practice in violation of CUTPA has the right to claim punitive damages and attorney's fees if the case is proved. See General Statutes § 42-110g (a) and (d); *Lenz* v. *CNA Assurance Co.*, 42 Conn. Supp. 514, 515, 630 A.2d 1082 (1993). Indeed, the plaintiff claimed both punitive damages and attorney's fees in the present case. Whether a trial court awards them and in what amount is left to its discretion. See General Statutes § 42-110g (a). If the court found that the plaintiff had proved that the defendant had engaged in an unfair trade practice and that the unfair trade practice had caused the plaintiff a loss of customers in violation of CUTPA, then the plaintiff was entitled to have the court exercise its discretion to determine whether such an award of punitive damages and attorney's fees were warranted. As the court in *Lenz* v. *CNA Assurance Co.*, supra, 515, pointed out, the purpose of awarding punitive damages under CUTPA is to deter future unfair trade practices. See *Lenz* v. *CNA Assurance Co.*, supra, 515.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.

[1] The plaintiff also named A. F. Forbes, Inc., as a defendant, but subsequently withdrew the complaint as to that party. In this opinion we refer to Hess Corporation as the defendant for purposes of simplicity.

[2] The first three stations acquired by the plaintiff were located in New Haven, East Haven, and West Haven, and the fourth was located in Groton.

[3] As relevant to this appeal, the terms of each of the four dealer agreements are identical.

[4] General Statutes § 42-133*l* (f) provides in relevant part: "No franchisor, directly or indirectly, through any officer, agent or employee, shall do any of the following . . . (5) impose unreasonable standards of performance upon a franchisee; (6) fail to deal in good faith with a franchisee; (7) sell, rent or offer to sell to a franchisee any product or service for more than a fair and reasonable price . . . ." The plaintiff's right to commence a cause of action for violations of these provisions of the Connecticut Petroleum Product Franchise Act derives from General Statutes § 42-133n (a), which provides in relevant part: "Any franchisee may bring an action for violation of sections 42-133*l* or 42-133m in the Superior Court to recover damages

sustained by reason of such violation . . . . Such franchisee, if successful, shall be entitled to costs, including, but not limited to, reasonable attorney's fees."

[5] General Statutes § 42-133*l* (j) provides: "Any waiver of the rights of a franchisee under sections 42-133m, 42-133n and this section which is contained in any franchise agreement entered into or amended on or after October 1, 1977, shall be void."

[6] Neither party briefed or otherwise took issue with the clause in § 31 of the dealer agreements providing that disputes are governed by federal law and must be heard in United States District Court. Accordingly, any claims regarding such issues are deemed waived.

[7] During his testimony at the October 16, 2012 evidentiary hearing, Savin admitted that he was "able to negotiate one or two amendments" to the dealer agreements, and that he did not recall there being any changes or amendments that he wanted to make but was not allowed to make. In its oral decision, the court explicitly found that there was evidence that certain provisions other than the jury trial waivers had been negotiated.

[8] The plaintiff incorrectly asserts that the trial court's decision regarding the enforceability of the jury trial waivers is subject to plenary review. Although "[*t*]*he standard* by which the trial court determines the validity of a jury trial waiver is a question of law that is subject to de novo review," the distinct question of "[*w*]*hether* a party has waived his right to a jury trial presents a question of fact" that we review only for clear error. (Emphasis added; internal quotation marks omitted.) *L & R Realty* v. *Connecticut National Bank*, supra, 246 Conn. 8; see also *Perricone* v. *Perricone*, 292 Conn. 187, 208–209, 972 A.2d 666 (2009).

[9] The defendant asserts that the plaintiff has no right to a trial by jury with regard to its causes of action for violations of the Connecticut Petroleum Product Franchise Act and CUTPA because neither of those claims existed when article first, § 19, of the Connecticut Constitution was adopted in 1818. Because we conclude that the express jury trial waivers executed in the dealer agreements are fully enforceable against the plaintiff, we need not address these arguments.

[10] The plaintiff also argued in its supplemental reply that, because trial was scheduled to begin later that month, "[i]nasmuch as an evidentiary hearing is a prerequisite for any sustaining of the defendant's objection, it is prejudicial to the plaintiff, both in terms of its trial preparation and the obvious delay in the commencement of trial that such an evidentiary hearing will necessitate, to now entertain the defendant's objection."

[11] The plaintiff also argued that maintaining its status as "low man on the street" was critical to its ability to compete because, unlike other gas stations, the plaintiff's stations lacked modern features and other amenities typically attractive to customers, such as easy roadway access, public restrooms, and convenience stores.

[12] The plaintiff did not rely upon its earnings and sales volumes during 2001 and 2002, presumably because those numbers did not account for the income generated by the fourth gas station, which the plaintiff did not acquire until December, 2002.

[13] The summary of operations reflects that the plaintiff generated a net income of $428,498 in 2005, $162,109 in 2006, $228,330 in 2007, $190,475 in 2008, $198,210 in 2009, $64,409 in 2010, and $165,882 in 2011. The sum of the approximate differences between each of those figures and $603,000 is $2,784,000.

[14] The plaintiff argues that the court's calculation of the $452,777.34 "shortfall" was incorrect because it (1) considered the profit per gallon that the plaintiff generated from 2001 through 2004, before the defendant began to price dealer tankwagon charges improperly, thereby "dilut[ing]" the disparity between the plaintiff's actual profit margin and the eight cent margin during the period at issue, and (2) failed to take into account the plaintiff's lost sales volumes.

[15] CUTPA requires proof of an ascertainable loss rather than damages in the traditional sense. See part II B of this opinion. Accordingly, although the trial court did not do so in its memorandum of decision, we address CUTPA separately from the Connecticut Petroleum Product Franchise Act and the covenant of good faith and fair dealing.

[16] The defendant asserts that the court was not calculating the plaintiff's lost profits when it noted the "shortfall" of $452,777.34. Regardless of whether the court was calculating the plaintiff's lost profits, however, the court's finding indicated that it was *able*, on the basis of the evidence adduced at trial, to determine the lost profits sustained by the plaintiff as

a result of the defendant's alleged improper pricing.

[17] As previously noted; see footnote 14 of this opinion; the plaintiff asserts that, in determining that the summary of operations reflected a $452,777.34 "shortfall," the court failed to take into account the plaintiff's losses in sales volumes and used faulty math. To resolve the present appeal, however, we need not determine whether the plaintiff has proved the full extent of its claimed damages with reasonable certainty. Accordingly, we do not address whether the court clearly erred in failing to conclude that the plaintiff proved its full damages claim in the amount of $2,784,000 with reasonable certainty.