******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# DEAN S. BARR *v.* MFI MANAGEMENT, INC., ET AL.

# FIH, LLC *v.* DEAN S. BARR ET AL.
## (AC 47069)

Moll, Westbrook and Sheldon, Js.

*Syllabus*

In two separate actions that were consolidated for trial, which involved allegations of fraud in connection with private investments, B, the plaintiff in the first action and the named defendant in the second action, and M, a defendant in the second action, appealed from the trial court's judgments for the named defendant et al. in the first action and F Co., the plaintiff in the second action. After the actions had been consolidated, the parties represented to the trial court in several joint case management proposals that the actions would be tried to a jury and filed jury claims in the separate actions they brought. F Co. thereafter filed motions to erase both of the consolidated actions from the jury docket, arguing, inter alia, that B's jury claim was untimely under the applicable statute (§ 52-215). The trial court granted F Co.'s motions to erase, reasoning that the jury claims in both actions were untimely, that the parties had not provided written consent to a jury trial under § 52-215, and that a jury claim could be withdrawn at any time in the absence of prejudice to the opposing party. B and M claimed that the trial court improperly removed the actions from the jury docket and proceeded with a bench trial. *Held*:

This court reversed the judgments of the trial court and remanded the actions for a jury trial, as § 52-215 permits a case to be entered at any time on the jury docket upon the parties' written consent, and the trial court, in granting F Co.'s motions to erase, improperly focused on the timing of the parties' jury claims, which was not pertinent to whether they provided written consent by virtue of their jury claims.

This court determined that B's filing of a jury claim in the action he brought, along with the F Co.'s filing of a certificate of closed pleadings in that action, which also indicated that the matter would be tried to a jury, constituted written consent by both parties to enter the consolidated actions on the jury docket in accordance with § 52-215, and F Co. further expressed its consent to having the two actions tried together to a jury when it thereafter filed its own jury claim in the action it brought.

The trial court erred in granting F Co.'s motions to erase and in concluding that F Co. retained the right to unilaterally withdraw its consent to a jury trial once the action it brought was properly placed on the jury docket, as nothing in § 52-215 authorized such a unilateral change and, with it, the

unilateral denial of an opponent's right to a jury trial, and the placement of a case on the jury list upon the written consent of all parties fixed each party's right to a jury trial and prevented the court from erasing the case from the jury docket except by agreement of all parties.

Argued February 10—officially released September 9, 2025

*Procedural History*

Action, in the first case, to recover damages for, inter alia, defamation, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and transferred to the Complex Litigation Docket, where the action was withdrawn as against the defendant Joseph Meehan et al.; thereafter, the court, *Lee, J.*, granted in part the motion to dismiss filed by the named defendant et al.; subsequently, action, in the second case, to recover damages for, inter alia, violation of the Connecticut Uniform Securities Act, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and transferred to the Complex Litigation Docket; thereafter, the court, *Ozalis, J.*, granted the motion for judgment filed by the defendant Lazar Milstein et al. in the first case as to certain counts of the complaint; subsequently, the action in the first case was withdrawn in part, and the cases were consolidated for trial; thereafter, the named defendant et al. in the second case filed a counterclaim; subsequently, the court, *Ozalis, J.*, granted in part the motion for summary judgment filed by the named defendant et al. in the first case and granted in part the motion for summary judgment filed by the counterclaim defendant et al. in the second case; thereafter, the court, *Ozalis, J.*, granted the motions filed by the named defendant et al. in the first case and the plaintiff in the second case to erase the cases from the jury docket; subsequently, the cases were tried to the court, *Ozalis, J.*; judgments in part for the named defendant et al. in the first case and for the plaintiff in the second case; thereafter, the court, *Ozalis, J.*, granted the motions

filed by plaintiff in the first case and named defendant et al. in the second case to modify the court's damages award, and the plaintiff in the first case and the named defendant et al. in the second case appealed to this court. *Reversed*; *new trial.*

*Joseph M. Pastore III*, with whom were *Melissa Rose McClammey* and *Paul Fenaroli*, and, on the brief, *Tyler Rutherford*, for the appellants (plaintiff in the first case, named defendant et al. in the second case).

*Jonathan M. Freiman*, with whom were *Emmett Gilles* and, on the brief, *James I. Glasser* and *David Norman-Schiff*, for the appellees (named defendant et al. in the first case, plaintiff in the second case).

*Opinion*

SHELDON, J. The sole issue in this appeal is whether the trial court improperly removed the parties' consolidated actions from the jury docket less than one month before trial was scheduled to begin and thereafter proceeded to judgment in both actions with a bench trial. The appellants, Dean S. Barr and Joseph Meehan (collectively, Barr parties), appeal from the judgments rendered against them following that trial in favor of the appellees, FIH, LLC (FIH), MFI Management, Inc. (MFI), LAZ May 10, LLC (LAZ May 10), Lazer Milstein, and Nesanel Milstein (collectively, FIH parties).[1] The Barr parties claim that the court improperly removed the actions from the jury docket because, inter alia,[2] they

---

[1] As explained subsequently in this opinion, the present appeal involves two actions, with counterclaims filed in each action, in which the parties are variously identified as plaintiffs and defendants. For convenience, we refer to the appellants collectively as the Barr parties and the appellees collectively as the FIH parties, and we refer to the parties individually by name when appropriate.

[2] The Barr parties also claim that the court improperly removed the actions from the jury docket because the actions properly were entered on the jury docket by order of the court and by way of Barr's original complaint. In light of our conclusion, we do not fully address these alternative arguments. See footnote 17 of this opinion.

properly had been entered in the docket as a jury case upon written consent of all parties pursuant to General Statutes § 52-215.[3] We agree, and accordingly reverse the judgments of the trial court and remand both actions for a jury trial.

Our principal focus in this case is on § 52-215, which governs the manner in which a case may be entered on the jury docket. Section 52-215 sets forth four different ways in which a case may be entered on the docket as a jury case: (1) upon the written request of either party within thirty days after the return day, (2) upon the request of either party within ten days after an issue of fact is joined, (3) upon written consent of all parties, or (4) by order of court. We are principally concerned with the language in § 52-215 that provides that a case "may at any time be entered in the docket as a jury case by the clerk, upon written consent of all parties" and consider whether the Barr parties are correct in claiming that the parties' filings in the present case satisfied that provision.

---

[3] General Statutes § 52-215 provides in relevant part: "The following-named classes of cases shall be entered in the docket as jury cases upon the written request of either party made to the clerk within thirty days after the return day: Appeals from probate involving the validity of a will or paper purporting to be such, appeals from the actions of commissioners on insolvent estates, and, except as hereinafter provided, civil actions involving such an issue of fact as, prior to January 1, 1880, would not present a question properly cognizable in equity, except that there shall be no right to trial by jury in civil actions in which the amount, legal interest or property in demand does not exceed two hundred fifty dollars or in a summary process case. When, in any of the above-named cases an issue of fact is joined, the case may, within ten days after such issue of fact is joined, be entered in the docket as a jury case upon the request of either party made to the clerk; and any such case may at any time be entered in the docket as a jury case by the clerk, upon written consent of all parties or by order of court. All issues of fact in any such case shall be tried by the jury, provided the issues agreed by the parties to be tried by the court may be so tried. All cases not entered in the docket as jury cases under the foregoing provisions . . . shall be entered on the docket as court cases, and shall, with all issues of law and issues of fact, other than those hereinbefore specified, which may be joined in actions entered on the docket as jury cases, be disposed of as court cases."

With those questions in mind, we turn first to the facts of this case, as found by the trial court, and the procedural history by which the judgments herein challenged were rendered. The Barr parties are the cofounders of Foundation Capital Partners, LLC (Foundation), a company formed in 2010 to act as a general partner and to manage the operations of a private equity fund, Foundation Capital Partners, LP. Barr was the managing partner of Foundation, and Meehan was its chief operating officer. Pursuant to Foundation's operating agreement, Barr and Meehan each held approximately 46 percent of the management interest in Foundation.

FIH is a company that was specifically created in February, 2014, to invest in Foundation. FIH is solely owned by LAZ May 10, and Lazer is the sole manager of FIH and LAZ May 10. Lazer's son, Nesanel, holds an economic interest in FIH and is an agent and authorized representative of FIH.

Nesanel was first contacted about the possibility of investing in Foundation in October, 2013. MFI, a corporation owned solely by Nesanel, entered into a nondisclosure agreement with Foundation in November, 2013.[4] Between November, 2013, and February, 2014, Nesanel and Greg Dyra, a hedge fund expert and investment advisor, worked together through MFI to perform due diligence as to the advisability of FIH investing in Foundation. In so doing, Nesanel and Dyra visited Foundation's offices, spoke to Foundation employees and investors, and evaluated Foundation's investment strategy, financial projections, and investment progress.

Hall O'Donnell, an employee of Foundation, provided Nesanel and Dyra with certain due diligence materials, which represented that Foundation had an experienced management team whose members had known each other for many years and worked well together. Such

---

[4] As previously noted, FIH was not created until February, 2014.

materials further represented that Foundation's investment pipeline had become increasingly active in recent months, which Barr corroborated by presenting Nesanel and Dyra with a performance model for Foundation, which showed that it expected to complete four deals by June, 2014.

While conducting due diligence as to FIH's possible investment in Foundation, Dyra learned that the Barr parties were married to sisters, and that Barr and his then wife, Meehan's sister-in-law, were in the midst of a divorce. Barr told Dyra, however, that his divorce "posed no threat" to Foundation or to FIH's potential investment in it. Barr specifically told Dyra that his divorce would not interfere with his relationship with Meehan and that they could still work together professionally.

In February, 2014, FIH made a series of investments in Foundation totaling $6.75 million. The approval for FIH's investments was given by Lazer on the recommendation of Nesanel, who, in turn, based his recommendation on input he had received from Dyra. Nesanel claimed that he based his recommendation on a number of factors, including the representations by Barr and Meehan that Foundation had a strong management team that worked well together and had a strong pipeline of deals ready to proceed.

Less than one month after FIH made its investments, Meehan asked to meet with Dyra. At the meeting, Meehan told Dyra that Barr's behavior had deteriorated rapidly after FIH made its investments. Meehan advised FIH, through Dyra, that he was no longer able to control Barr and, as a result, that the future of Foundation was being threatened. On April 1, 2014, Meehan provided Dyra with a memorandum he had drafted, which he titled "Project Soothsayer" (Project Soothsayer memorandum), along with a series of emails in support

thereof. In the Project Soothsayer memorandum, Meehan wrote that Barr was "actively destroying value for [Foundation's] members, due to his rampant financial difficulties, his functional inability to . . . tell the truth at any juncture, his rude and dismissive attitude towards his colleagues, and his desire to be the only point of contact with potential investments or investors." The memorandum further stated, inter alia, that Barr had few, if any, hedge fund contacts; Barr had no fundraising ability; Barr had exceptionally poor judgment and made exceedingly rash decisions without consideration of the opinions of Foundation staff; Barr's divorce would be messy, expensive and protracted; and Barr was misusing corporate funds for personal matters. Meehan concluded the memorandum by stating that Barr needed to be removed immediately from his leadership position at Foundation and that, in order to make that happen, FIH needed to buy out Barr's interest in Foundation.

Dyra delivered the Project Soothsayer memorandum to Nesanel. Nesanel claimed to be shocked by what he read, as the Project Soothsayer memorandum contained information not previously disclosed to him or Dyra. The supporting evidence, including the emails accompanying the memorandum, predated FIH's investments in Foundation, but none of them had been shown to FIH during the due diligence period. Nesanel subsequently provided the Project Soothsayer memorandum and the accompanying emails to a representative of the Bancroft Family Trust (Bancroft), which had invested in Foundation prior to FIH. As time went on, Foundation was unable to close on any of the deals on which it claimed to have been working when FIH made its investments.

In June, 2014, Dyra, on behalf of FIH, and a representative of Bancroft met with Barr and presented him with a proposed memorandum of understanding that

would have required both Barr and Meehan to step down from their positions at Foundation if FIH and Bancroft provided additional financing to Foundation as Meehan had proposed. Within twenty-four hours of this meeting, Barr rejected the proposed memorandum of understanding.

In August, 2014, Nesanel, on behalf of FIH, wrote to Barr and Meehan at Foundation, requesting the recission of FIH's investments. In support of this request, Nesanel wrote that FIH had been "improperly induced into investing in [Foundation] in the first place." Meehan, on behalf of Foundation, refused FIH's request for recission, citing the extensive due diligence performed by Nesanel and Dyra before FIH made its investments.

In September, 2014, O'Donnell and Joseph Elmlinger, who had previously worked for Foundation, created a new company, IM Partners, for the express purpose of pursuing potential acquisitions of hedge fund management companies. Elmlinger and O'Donnell solicited FIH to invest in IM Partners. In addition, IM Partners obtained an informal agreement with Fortress Credit Corporation (Fortress)—which already had an agreement with Foundation[5]—that gave Fortress the option of investing up to $1 billion in deals sourced by IM Partners. Ultimately, however, FIH declined to invest in IM Partners, and IM Partners never completed any deals with Fortress.

Around this same time, Nesanel connected separately with Joel Holsinger, a representative of Fortress whom he had met while conducting due diligence on Foundation. Nesanel also arranged a meeting with a representative of Bancroft, Foundation's other large shareholder

---

[5] Fortress had an agreement with Foundation that gave Fortress the option, at its discretion, to invest in deals sourced by Foundation. The agreement required that Foundation provide Fortress with an exclusive "first look" or "right of first refusal" on potential deals.

that had previously joined FIH in presenting the proposed memorandum of understanding to Barr. Thereafter, there were communications between Nesanel and Bancroft in which Bancroft's representative mentioned meeting with Nesanel "when we have determined that Fortress will partner with us toward a new venture . . . ." There were also later communications among Elmlinger, Lazer, and Nesanel that mentioned "an investment in NewCo . . . ."[6] Nesanel wrote to Holsinger to request a meeting with him and the representative of Bancroft on October 28, 2014. On that same date, Holsinger, on behalf of Fortress, declined to fund a deal that Foundation had been pursuing with a London based hedge fund called Arrowgrass Capital Partners LLP.

Meehan resigned from Foundation in November, 2014. Fortress subsequently terminated its agreement with Foundation and wrote to Barr, telling him that he had made "numerous misrepresentations" about its role to investors.[7] Barr closed Foundation on June 25, 2015. During its existence, Foundation did not make any acquisitions in pursuit of its business strategy and never generated any income. Foundation operated solely through capital contributions by outside investors such as FIH, which were used to pay salaries and operating expenses.

In September, 2017, Barr commenced an action against the FIH parties (Barr action).[8] In Barr's second

[6] As discussed subsequently in this opinion, Barr alleged that the FIH parties had created a new company and attempted to get Fortress to invest in the new company instead of in Foundation. Specifically, Barr claimed that the FIH parties conspired with former employees of Foundation, including Elmlinger and O'Donnell, and Bancroft to form NewCo, a new company that would implement Foundation's strategy without Barr or Meehan. Barr further claimed that the FIH parties took Barr's funding source, Fortress, and made Fortress end its relationship with Barr and Foundation.

[7] Barr speculated that it was Nesanel who told Fortress that he had made misrepresentations to investors.

[8] Meehan, Dyra, Elmlinger and O'Donnell also were named as defendants in the Barr action. Barr, however, withdrew his claims against Meehan,

amended complaint, he raised claims, inter alia, of violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; intentional infliction of emotional distress; and fraudulent misrepresentation.[9] Barr's claims were based, inter alia, on allegations that the FIH parties had published "shocking and blatant lies about [him] and his purported unfitness for a management position at [Foundation]" in order to cause Fortress not to invest in Foundation and, instead, to deflect that investment to a new company established by the FIH parties.

In February, 2020, FIH commenced its own action against Barr, Meehan, and Foundation (FIH action). The operative complaint in that action asserted claims of violation of the Connecticut Uniform Securities Act (CUSA), General Statutes § 36b-2 et seq.; negligent misrepresentation; unjust enrichment; and intentional misrepresentation/fraudulent inducement.[10] These claims were based on FIH's allegations that Barr and Meehan had fraudulently induced FIH to invest in Foundation. Specifically, FIH alleged that Barr and Meehan had misrepresented to it that Foundation had an increasing number of active deals in its investment pipeline, and

Elmlinger and O'Donnell. In addition, the court dismissed the claims against Dyra for defective service of process.

[9] Barr also raised claims of defamation, negligent misrepresentation, civil conspiracy to defraud, breach of fiduciary duty, unjust enrichment, statutory theft, and tortious interference with a business expectancy. After the FIH parties had filed a motion to strike the second amended complaint in the Barr action, Barr agreed to strike his claims alleging defamation, negligent misrepresentation, and statutory theft, and the court further granted the FIH parties' motion to strike Barr's claims for unjust enrichment and tortious interference with a business expectancy. The FIH parties filed a motion for judgment on those counts, which the court granted. In addition, Barr subsequently withdrew his counts for civil conspiracy to defraud and breach of fiduciary duty.

[10] FIH also raised these claims in a counterclaim in the Barr action. Because FIH asserted identical claims in the FIH action, however, the court granted Barr's motion to dismiss the counterclaim on the basis of the prior pending action doctrine.

that Barr's ongoing divorce from Meehan's sister-in-law " 'posed no threat' " to Barr's and Meehan's ability to work together effectively.

Barr denied FIH's claims and filed a counterclaim against it in the FIH action. Barr's counterclaim asserted claims sounding in recoupment on the basis, inter alia, of the same alleged violation of CUTPA he had raised as an affirmative claim for relief in the Barr action. The Barr action and the FIH action subsequently were consolidated, by consent of the parties, for trial purposes only.[11]

On May 23, 2022, Barr filed a claim for trial by jury in the Barr action. On that same date, the FIH parties filed a certificate of closed pleadings in that action, indicating therein that the case would proceed as a jury trial by checking off the box for "jury trial" on the official Judicial Branch form. On August 1, 2022, FIH filed a claim for trial by jury in the FIH action. On that same date, FIH filed a certificate of closed pleadings in that action, similarly indicating therein that the case would proceed as a jury trial, by checking off the box for "jury trial" on the official Judicial Branch form.

There were also several other filings by the parties, prior to the filing of their respective jury claims, that reflected their mutual selection of a jury trial in these consolidated cases. For instance, Barr, who was self-represented at the time he commenced his action against the FIH parties, included a footer on each page of his original complaint, filed September 22, 2017, with

_____

[11] The actions were consolidated on December 16, 2020, after the parties filed a joint proposed case management order that "advise[d] the court that they consent to the consolidation of this matter with [the FIH action] for trial purposes only . . . ." That joint proposed case management order specifically mentioned jury selection and, as explained later in this opinion, the parties continued to make certain filings indicating that the consolidated actions would be tried to a jury by proposing the date on which jury selection should begin.

the notation "Jury Trial Requested." Barr did not file a jury claim form, however, or pay the fee required for such a filing, until May 23, 2022. Shortly after Barr commenced his action, however, on December 22, 2017, the FIH parties filed an application to refer that action to the Complex Litigation Docket on which they checked the box indicating that the matter had been "claimed for jury trial." In addition, almost three years later, on August 25, 2020, the FIH parties filed a corresponding application to refer the FIH action to the Complex Litigation Docket on which they too checked the box indicating that that matter had been "claimed for jury trial." Consistent with these filings, on December 16, 2020, the parties jointly filed a proposed case management order in the Barr action in which they stated that that action had been scheduled for a consolidated trial with the FIH action, with "jury selection beginning on November 15, 2022, at 10 a.m. and trial beginning December 5, 2022, at 10 a.m." Later joint filings of amended case management orders on December 27, 2021, and May 4, 2022, similarly represented that the consolidated actions would be tried to a jury by specifying dates for both the selection of the jury and the start of evidence at trial.

In December, 2022, the court ruled on motions for summary judgment that the FIH parties had filed. In the Barr action, the court rendered summary judgment in favor of the FIH parties on Barr's claims of intentional infliction of emotional distress and fraudulent misrepresentation. The court denied in part the FIH parties' motion for summary judgment, as it related to Barr's affirmative CUTPA claim, because it concluded, inter alia, that a genuine issue of material fact existed as to whether the FIH parties' exploration of potential transactions involving Fortress, outside of their relationship with Foundation, was unfair and/or deceptive, and thus in violation of CUTPA. In the FIH action, the

court rendered summary judgment in favor of the FIH parties on Barr's counterclaim and all of Barr's recoupment claims except for his CUTPA claim.

On January 31, 2023, the court issued a scheduling order in which it ordered jury selection to begin on February 14, 2023. On February 3, 2023, the FIH parties filed a case flow request in both actions seeking to reschedule jury selection. In a joint statement attached to the request, the parties stated that the court's scheduling orders and electronic docket had long indicated that trial would begin on March 6, 2023, but did not specifically identify a date for jury selection. The parties further stated that, "[b]ased on the scheduling orders and electronic docket, all parties planned that trial proceedings would begin on March 6, 2023—jury selection first, with evidence to follow," and that, "given the prior scheduling orders, the parties did not anticipate that jury selection would proceed prior to March 6, 2023, and therefore structured their schedules accordingly." Given the professional and personal conflicts of the parties, the FIH parties requested that jury selection begin on March 8, 2023, with evidence to follow immediately after jury selection. The FIH parties also conveyed the Barr parties' position that they could make themselves available to conduct jury selection in late February or early March.

On February 8, 2023, the court held a trial management conference. The court opened the conference by stating that it first wanted to discuss the issue of jury selection, which was then scheduled to begin the following Wednesday. The court explained that it had looked at a scheduling order it had issued on May 9, 2022, in which it had ordered the parties to file, inter alia, a certificate of closed pleadings and had scheduled evidence to commence on March 6, 2023. The court stated that it had noticed that jury selection was not scheduled in that order and, when trying to determine

the reason why, it had realized that the claim for a jury trial had not been filed until May 23, 2022, after the court's scheduling order was issued.

The court then told the parties: "[C]learly, the jury claims have been filed. You are entitled to a jury trial, nobody has moved to strike them for any reason, and we're doing that, and the question is scheduling." As the court continued to discuss the timing of jury selection, however, the FIH parties' counsel interjected as follows: "[O]bviously, there have been notices for jury trials filed, but the record should be clear, for my clients, we're fine to proceed before the court if that were a possibility, and stick to the original schedule, I suppose that's in [the Barr parties' counsel's] court, but we would be fine proceeding with a courtside trial." The Barr parties' counsel responded that the Barr parties wanted to preserve their right to a jury trial. The court then proposed the possibility of trying the actions separately, with the FIH action proceeding as a bench trial and the Barr action proceeding as a jury trial. The Barr parties' counsel responded that he would consider that option and discuss it with his clients. The court thereupon scheduled a status conference for February 10, 2023, concerning whether the FIH action would proceed as a bench trial or as a jury trial.

The next day, February 9, 2023, the Barr parties filed a memorandum in the FIH action titled "Statement Regarding Jury Trial." In the memorandum, the Barr parties argued that the clerk had entered the case on the docket as a jury case after FIH filed its jury claim, and thus they were entitled to have their case tried to a jury, pursuant to § 52-215, which provides that a case "shall" be tried by a jury once it is entered on the docket as a jury case, unless the parties agree to a bench trial. The Barr parties stated that they wanted to exercise their right to a jury trial, and thus they declined to agree to trying the matter to the court. They also argued that,

even though they did not file a claim for a jury, they did not waive their right to a jury trial. Finally, citing *Hammer* v. *Posta*, 170 Conn. App. 701, 709, 155 A.3d 801 (2017), the Barr parties argued that, once a plaintiff files a jury claim, there is no reason for a defendant to file a jury claim.

On February 10, 2023, the FIH parties filed motions to erase both of the consolidated actions from the jury docket.[12] In their motion to erase in the Barr action, the FIH parties argued that Barr's jury claim was untimely because, pursuant to § 52-215, it was not filed within thirty days from the return date or within ten days after the final joinder of the issues of fact, which had taken place on September 20, 2021, eight months before Barr filed his jury claim. The FIH parties further argued that Barr's failure to file a timely jury claim constituted a waiver of his right to file such a claim. The FIH parties acknowledged that they could have filed their motion to erase sooner but noted that there was "no appellate decision or rule of practice establishing a time limitation on the filing of an objection to a jury trial claim," citing *Aldin Associates Ltd. Partnership* v. *Hess Corp.*, 176 Conn. App. 461, 477, 170 A.3d 682 (2017). In their separate motion to erase in the FIH action, FIH contended the actions were "well suited to adjudication by the court" and that a bench trial would avoid the inefficiency and added costs of a jury trial. FIH argued that its own jury claim was untimely pursuant to § 52-215 because it was not filed until August 1, 2022, a few days after July 28, 2022, which would have been ten days from when the final joinder of the issues of fact in that action occurred. FIH further argued that, given the untimeliness of its jury claim in the FIH action, the Barr parties could not reasonably have relied on that claim as a basis for failing to file their own claim in that action

---

[12] The FIH parties filed two separate motions to erase, one in each of the actions.

in a timely manner, and, thus, that they had waived their right to a jury trial in that action as well.

The Barr parties filed objections to the FIH parties' motions to erase the actions from the jury docket. The Barr parties argued, inter alia,[13] that the parties repeatedly and frequently had consented in writing to trying both consolidated actions to a jury, and, pursuant to § 52-215, that a case "may at any time be entered in the docket as a jury case by the clerk, upon written consent of all parties . . . ." The FIH parties filed replies on February 15, 2023, in which they denied that they had ever consented to a jury trial.

The court heard oral argument on the motions to erase on February 16, 2023. At the hearing, the court first inquired of the Barr parties why they had not filed their own jury claim in the FIH action. The Barr parties' counsel explained that they were relying on the "historical consent and the filing by the [FIH parties]." The court asked if the Barr parties' counsel had had any conversation with the FIH parties' counsel around that time as to who was going to file a jury claim. The Barr parties' counsel responded that he personally did not have such a conversation with the FIH parties' counsel, but that his cocounsel, who was then away on vacation, would have. The FIH parties' counsel responded that he had no recollection of such a conversation, but he too had not reviewed the relevant emails. He also stated: "It would not surprise me if we had an email that said, hey, we'll be filing a jury claim today. But was there ever an email where we said FIH consents to a jury claim; no, there was nothing to that effect, Your Honor."

---

[13] The Barr parties also argued that Barr first made a timely request for a jury trial when he filed his original complaint, by including the words "jury trial requested" in the footer of every page. At the subsequent hearing on the FIH parties' motions, however, the Barr parties' counsel acknowledged that Barr's request for a jury trial in this manner was legally insufficient.

The parties subsequently filed supplemental memoranda of law in each action in support of their respective positions. They addressed the court's inquiry at the hearing about the correspondence between the parties regarding the jury claim filed by Barr in the Barr action on May 23, 2022, and the jury claim filed by FIH in the FIH action on August 1, 2022.

The Barr parties attached copies of certain email chains to their supplemental memoranda of law. Specifically, with respect to the Barr action, the Barr parties provided the court with emails dated May 22 and 23, 2022, in which the FIH parties' counsel contacted the Barr parties' counsel about filing the certificate of closed pleadings. The Barr parties' counsel responded: "The [c]ertificate looks fine, thank you. Please confirm whether you will also be filing [c]laim for [j]ury ([f]orm JD-CL-53) together with the [c]ertificate." The FIH parties' counsel responded: "Can you please file the [j]ury [c]laim [f]orm? We can still handle filing of the [c]ertificate of [c]losed [p]leadings, once the [j]ury [c]laim [f]orm has been filed. Or if you will file, that's fine too (but the e-filing system will not allow us to file the certificate without the jury claim form being filed first). Thanks." The Barr parties' counsel responded: "Yes. Please see attached the [j]ury [c]laim [f]orm to be filed," and the FIH parties' counsel responded: "Sure. Just serve us the 'as-filed' version. Thanks." After the Barr parties' counsel sent the copy of the filed jury claim, the FIH parties' counsel responded: "Thank you . . . . We will proceed with filing the [certificate] of [c]losed [p]leadings." The Barr parties argued that, in light of these communications between the parties and the certificate of closing pleadings filed by FIH in the Barr action, in which FIH had checked off the box for "jury trial," the requirements set forth in § 52-215 for "written consent of all parties" had been met.

With respect to the FIH action, the Barr parties provided the court with emails dated August 1, 2022, in which the Barr parties' counsel asked the FIH parties' counsel to "[p]lease confirm that you will be filing the certificate of closed pleadings today in the FIH matter," which the FIH parties' counsel subsequently confirmed. The Barr parties claimed that, after this email correspondence, FIH filed a claim for a jury trial and, shortly thereafter, the certificate of closed pleadings indicating that the case, which had been consolidated for trial purposes with the Barr action, would proceed as a jury trial.

In their supplemental memoranda of law in response, the FIH parties argued that the emails submitted by the Barr parties did not demonstrate their consent to a jury trial. Specifically, with respect to the Barr action, the FIH parties argued, inter alia, that the emails were "nothing more than run-of-the-mill logistical emails between counsel concerning the filing of a certificate of closed pleadings," and claimed that "both parties were proceeding on the misapprehension that [Barr's] jury claim could still be timely submitted." Regarding the FIH action, FIH argued that the email correspondence submitted by the Barr parties did not mention a jury claim or a jury trial, but instead only discussed the filing of the certificate of closed pleadings. Accordingly, it argued that "[n]othing in the proffered email chain demonstrates that [the Barr parties] were relying on [FIH's] jury claim or that the parties jointly consented in writing to having a jury trial."

On February 17, 2023, the court issued memoranda of decision granting the FIH parties' motions to erase the actions from the jury docket.[14] In its decisions, the court first determined that the jury claims filed in both

_____

[14] The court issued two separate, but substantially similar, memoranda of decision, with one decision issued in each action.

actions were untimely inasmuch as they were not filed within thirty days from the return dates or within ten days after the final joinder of the issues of fact in those actions. With respect to the Barr action, the court found that "no adequate reason was presented for [Barr's] filing of a jury claim eight months after issue was joined. [Barr] could and should have timely filed the jury claim when he saw the [FIH parties] had not timely filed one in this action to protect his rights, but chose not to do so." The court reached a similar conclusion in the FIH action, explaining that "the [Barr parties] easily could have filed a claim for jury themselves within thirty days after the return day or within ten days of issue being joined. For whatever reason, the [Barr parties] made the decision not to do so." The court rejected the Barr parties' argument that they had relied on FIH's filing of the jury claim in failing to file their own, because FIH's claim was untimely filed. In addition, the court found that the emails attached to the Barr parties' supplemental memorandum did not reflect an agreement between the parties that FIH would file the jury claim, because the emails only concerned the filing of the certificate of closed pleadings.

The court rejected the Barr parties' argument that the parties had provided written consent to a jury trial in both actions. The court relied, in so ruling, on the FIH parties' arguments in their motions to erase and in their replies to the Barr parties' objections. Specifically, the court determined that the parties' various proposed scheduling orders that mentioned jury selection did not operate as the written consent required because, "[w]hile a party may reflect its intent in proposed scheduling orders to claim a case for jury, it does not get a jury trial unless it properly complies with § 52-215 and Practice Book § 14-10. To find otherwise would make § 52-215 and Practice Book § 14-10 irrelevant, which they clearly are not."

In addition, in the Barr action, the court rejected Barr's contention that the FIH parties' checking off the box for "jury trial" on the May 23, 2022 certificate of closed pleadings constituted written consent to a jury trial, explaining: "[Barr] enormously inflates and erroneously interprets the meaning of that checked box to be an opposing parties' 'written consent.' He also completely ignores the fact that he filed a claim for jury trial on the very same day, and the certificate of closed pleadings accurately reflects that filing."

The court reached a similar conclusion with respect to the certificate of closed pleadings filed in the FIH action. In that action, however, the court agreed with the Barr parties that the jury claim filed by FIH "means the agreement to a jury trial in that case." Nevertheless, it concluded that "[a] party is free to change [its] position and withdraw its claim for a jury trial at any time, even shortly before trial." The court further concluded that the Barr parties were not entitled to claim that they relied on FIH's filing of that jury claim in failing to file their own, because they "cannot get the benefit of an untimely filed jury claim."

The court also found that there were no "compelling circumstances" to warrant denying the FIH parties' motions. The court explained: "The closest the court came to a compelling circumstance was the [Barr parties'] argument on February 16, 2023, that counsel for all parties had agreed that [FIH] would timely file the jury claim and the [Barr parties] relied on that position. However, there is no evidence that there was an agreement that [FIH] would timely file a jury claim. The only evidence before this court was that [FIH] would file the certificate of closed pleadings by August 1, 2022, the date the court ordered it to be filed by. . . . Even if the [Barr parties] believed that a jury claim was to be filed by [FIH] on [the] same date as the certificate of closed pleadings was filed, they should have known

that this was too late to file a claim for a jury trial and taken action to file a timely claim. This court has no evidence before it that the [Barr parties] were tricked into complacency with respect to the timely filing of the jury claim." (Citation omitted.) Finally, the court concluded that the Barr parties would not be prejudiced by proceeding with a bench trial rather than a jury trial.

The court held a bench trial at the end of March, 2023. On August 21, 2023, the court issued a single memorandum of decision resolving both actions by rendering judgments in them in favor of the FIH parties. The court found, in the FIH action, that FIH had proven its claim that the Barr parties had violated CUSA and that they were also liable for negligent misrepresentation and fraudulent misrepresentation. In light of its conclusions on those claims, the court did not consider the FIH parties' alternative claim of unjust enrichment. The court also found that Barr had failed to prove that the FIH parties had violated CUTPA. Accordingly, the court rejected the affirmative CUTPA claim alleged in the Barr action and the recoupment claim based on the same alleged violation of CUTPA in the FIH action. The court thereafter awarded FIH $6.75 million in damages, plus prejudgment interest at the rate of 8 percent per year, in addition to attorney's fees and costs.

On August 29, 2023, the Barr parties filed a motion to reduce the amount of the award in light of certain settlement payments that FIH had received in a separate federal case that was based on the same underlying facts.[15] The court granted the Barr parties' motion and

---

[15] In 2015, FIH filed an action in federal court asserting federal securities law claims and the same state law claims asserted in the present case against Foundation, Barr, and Meehan, among others. The United States District Court for the District of Connecticut rendered summary judgment against FIH on FIH's federal securities law claims and dismissed FIH's state law claims for lack of subject matter jurisdiction. See *FIH, LLC* v. *Foundation Capital Partners, LLC*, United States District Court, Docket No. 3:15-cv-785 (JBA) (D. Conn. January 31, 2018), vacated, 920 F.3d 134 (2d Cir. 2019). The United States Court of Appeals for the Second Circuit vacated the

modified the award to $6,987,833.33, inclusive of interest, before attorney's fees and costs.[16] This appeal followed.

On appeal, the Barr parties claim that the court improperly removed both actions from the jury list and proceeded with a bench trial. Specifically, the Barr parties claim that (1) the two actions, which had been consolidated for trial, had properly been entered in the docket as a jury case upon written consent of all parties pursuant to § 52-215,[17] and (2) once the case was properly entered on the jury docket, the court lacked the

judgment in its entirety. See *FIH, LLC* v. *Foundation Capital Partners, LLC*, 920 F.3d 134, 146 (2d Cir. 2019).

On remand, the District Court concluded that its dismissal of the state law claims remained in place and proceeded to trial on the federal securities law claims. See *FIH, LLC* v. *Foundation Capital Partners, LLC*, United States District Court, Docket No. 3:15-cv-785 (JBA) (D. Conn. October 22, 2019), aff'd sub nom. *FIH, LLC* v. *Barr*, Docket No. 20-489, 2021 WL 5286659 (2d Cir. November 15, 2021). A jury found in favor of Barr and Meehan. *FIH, LLC* v. *Barr*, Docket No. 20-489, 2021 WL 5286659, *1 (2d Cir. November 15, 2021). The Second Circuit subsequently upheld the jury's verdict and the District Court's decision not to exercise supplemental jurisdiction over the state law claims. See id., *2–6.

The other defendants—except for Foundation, which never appeared in the federal action—settled with FIH before trial. Id., *1 n.1. The Barr parties' motion to reduce the amount of the award in the present action was based on FIH's settlement with these parties, as it claimed that "FIH received certain amounts in consideration of withdrawing its claims against those parties."

[16] On January 23, 2024, after a hearing, the court awarded FIH $3,158,174.38 in attorney's fees and $214,730.97 in costs.

[17] The Barr parties also argue that Barr timely requested a jury trial by including the notation "Jury Trial Requested" in his original complaint. See footnote 13 of this opinion. As the Barr parties acknowledged at the February 16, 2023 hearing, however, requesting a jury trial in this manner is legally insufficient. See *Beizer* v. *Goepfert*, 28 Conn. App. 693, 702, 613 A.2d 1336 (1992) (jury claim was not properly filed where plaintiff failed to file jury docket claim slip and failed to pay jury claim fee), cert. denied, 224 Conn. 901, 615 A.2d 1044 (1992), cert. denied, 507 U.S. 973, 113 S. Ct. 1416, 122 L. Ed. 2d 786 (1993); *Christiano* v. *Cavallo*, Docket No. CV-13-6020247-S, 2015 WL 4380346, *2 (Conn. Super. June 26, 2015) ("[s]imply including a claim for a jury trial in a complaint [i]s insufficient"); see also Practice Book § 14-10 ("All claims of cases for the jury shall be made in writing, served on all other parties and filed with the clerk within the time allowed by

authority to remove it from the jury docket in the absence of the parties' mutual consent. The FIH parties respond that (1) they did not consent to having a jury trial in these consolidated actions, and that when they made statements in their written filings suggesting to the contrary—that the case would be tried to a jury— they were merely operating under the mistaken belief that the jury claims in the two actions had been timely filed, and (2) the trial court properly concluded that FIH was entitled to withdraw its "late filed" jury claim in the FIH action, and thus it properly ordered that that action be erased from the jury docket. We agree with the Barr parties.

We begin by setting forth the standard of review and legal principles relevant to this claim. The question of whether parties have provided written consent to a jury trial pursuant to § 52-215 may be a mixed question of fact and law, with the historical facts subject to review for clear error and the legal question of whether the established subsidiary facts constitute written consent subject to plenary review. See *State* v. *Andres C.*, 349 Conn. 300, 317 n.11, 315 A.3d 1014 (whether statement has been adopted or approved for purposes of rules of practice "may be a mixed question of fact and law, with the historical facts subject to review for clear error and the legal question of whether the established subsidiary facts constitute adoption or approval subject to plenary review"), cert. denied, U.S. , 145 S. Ct. 602, 220 L. Ed. 2d 236 (2024).

General Statutes § 52-215. The jury claim fee shall be paid at the time the jury claim is filed.").

In addition, the Barr parties contend that the actions were properly placed on the jury docket by order of the court. Specifically, the Barr parties argue that certain scheduling orders issued by the court, which scheduled jury selection and set deadlines for the parties to file any proposed jury instructions and jury interrogatories, "would each independently justify the matters being entered on the jury list . . . ." None of these orders, however, specifically enters the actions on the jury docket in the first instance. Accordingly, we focus our analysis on the Barr parties' claim regarding written consent.

There is no factual issue in the present case, however, because the relevant subsidiary facts—namely, the written filings of the parties—are undisputed. The issue of whether those undisputed facts met the legal standard for written consent set forth in § 52-215 is a question of law over which our review is plenary. See id. (issue presented question of law where relevant subsidiary facts were undisputed); see also *Burns* v. *Adler*, 325 Conn. 14, 33, 155 A.3d 1223 (2017) (whether undisputed facts met legal standard was question of law); *Bridgeport* v. *Plan & Zoning Commission*, 277 Conn. 268, 275, 890 A.2d 540 (2006) (whether party complied with certain statutory notice requirements was mixed question of fact and law subject to plenary review when facts were undisputed and dispute concerned "the trial court's application of [the statute] to those facts").

Furthermore, "[t]o the extent that the trial court's decision . . . requires us to construe [§ 52-215], our review is also plenary and is guided by our well established legal principles regarding statutory construction. . . . In construing statutes, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *Maghfour* v. *Waterbury*, 340 Conn. 41, 46, 262 A.3d 692 (2021).

We next turn to the legal principles governing the placement of civil actions on the jury docket. General Statutes § 51-239b provides: "In civil actions a jury shall be deemed waived unless requested by either party in accordance with the provisions of section 52-215." As stated previously in this opinion, § 52-215 identifies four ways in which a case may be entered on the docket as a jury case: (1) "upon the written request of either party

made to the clerk within thirty days after the return day," (2) "within ten days after such issue of fact is joined . . . upon the request of either party," (3) "at any time . . . upon written consent of all parties," and (4) "at any time . . . by order of court."

The first two methods set forth in § 52-215—involving requests made within thirty days after the return day or within ten days after such issue of fact is joined—contain "statutory deadlines" by which a party may, unilaterally, have the case placed on the jury docket. *Palumbo* v. *Barbadimos*, 163 Conn. App. 100, 118, 134 A.3d 696 (2016). If a party fails to comply with either of those statutory time limits, that party "waive[s] [his] right to unilaterally claim [his] . . . action to the jury docket," and the opposing party "acquire[s] the right to have the parties' dispute decided by the trial court." Id., 118–19. Even if a jury claim is untimely filed pursuant to those statutory deadlines, however, the trial court retains the discretion to deny a motion to strike the case from the jury docket. See *Falk* v. *Schuster*, 171 Conn. 5, 7–8, 368 A.2d 40 (1976) (trial court's refusal to strike case from jury docket was not abuse of its discretion even though request for jury was not filed within statutory period and case was erroneously entered on jury docket in first instance); see also, e.g., *Commission on Human Rights & Opportunities ex rel. Devito* v. *BTB Group, LLC*, Docket No. CV-22-6018129-S, 2025 WL 520942, *1–2 (Conn. Super. February 11, 2025).

The other two methods set forth in § 52-215 provide that a case may be placed on the jury docket "at any time" either upon written consent of all parties or by order of the court. Section 52-215, however, does not state precisely what kind of written consent or order of the court is required to satisfy that provision.

In the present case, the trial court ruled initially that the Barr parties had failed to satisfy the third prong of

§ 52-215 by showing that FIH had consented in writing to placing these consolidated cases on the jury list. It based that conclusion on two findings: first, that the FIH parties never filed any writing expressly consenting to placing the cases on the jury list, but merely submitted documents making passing references to the prospect of trying the cases to a jury; and second, that such passing references were made in documents filed for other purposes, without addressing the propriety of placing the case on the jury list, because the FIH parties and their counsel were unaware that they had the right to withhold consent to a jury trial due to the Barr parties' failure to file their jury claim form within the time prescribed by § 52-215 for the unilateral exercise of their right to a jury trial.

The trial court further ruled, as an alternative basis for granting the FIH parties' motion to erase the cases from the jury docket, that, even if they could be deemed to have consented in writing to placing the case on the jury docket in the FIH action, they retained the right to withdraw their consent at any time as long as their exercise of that right did not prejudice the rights of their opponents. Here, then, the trial court ruled that the FIH parties were entitled to have these cases erased from the jury list because the Barr parties would not be prejudiced by trying the cases to the court, as the court itself was very familiar with the cases based on its recent handling of summary judgment motions addressing them on the merits, and thus could bring the cases to trial fairly and expeditiously on the schedule established in the most recent case management order.[18]

---

[18] Specifically, in concluding that the Barr parties would not be prejudiced by its removal of the actions from the jury docket, the court explained: "The [Barr parties] have argued that they are prejudiced because they believed that this case was going to be tried before a jury, this issue has arisen shortly before trial to their detriment, and they want a jury to determine [FIH's] claims and their recoupment claim. [The Barr parties] believe they are prejudiced if this case is tried before this court. [FIH] conversely argues that it would be prejudiced if this case were not tried by the court due to

## I

The Barr parties challenge all aspects of the trial court's rulings on the motions to erase, contending first that the FIH parties' written filings clearly expressed their consent to trying the cases to a jury and that they were bound by those filings notwithstanding their lawyers' professed ignorance concerning their clients' right not to consent to a trial by jury after the statutory deadlines for the Barr parties to unilaterally file a jury claim had passed. The Barr parties contend, and we agree, that the consolidated actions properly were entered on the jury docket after both parties provided written consent to a jury trial through their filings in those actions.

In reaching this conclusion, we first consider the meaning of the term "written consent" as used in § 52-215. Because the legislature has not defined the term "written consent," as used in that provision, it is appropriate to consult contemporaneous dictionary definitions. See, e.g., *Cerame* v. *Lamont*, 346 Conn. 422, 428, 291 A.3d 601 (2023).[19] "In the absence of a definition

the economic savings and efficiency that arises from trying a bench trial versus a jury trial and the nature of the disputes in the cases. In these two consolidated cases, the parties have asserted complex multimillion dollar investment claims relating to a private equity fund, which makes this case an appropriate candidate for courtside resolution. This court also has great familiarity with the claims alleged by the parties. In the past six months, it has decided three separate motions for summary judgment filed in this case and the related Barr case, and this court is well equipped to: (1) understand the claims asserted in both cases; (2) [understand] how the cases are interrelated; (3) properly evaluate the evidence; (4) apply the law; and (5) render a just and fair verdict in both cases. Thus, this court finds that the [Barr parties] would not be prejudiced by a bench trial on the claims asserted by the parties in this case and the Barr case."

[19] The parties do not argue that § 52-215 is ambiguous or that this court should therefore resort to extratextual sources, such as legislative history, to ascertain the statute's intended meaning. Nevertheless, we note that the language regarding "written consent" first appeared in the 1902 revision of the statute and, because of the age of that provision, no legislative history is available addressing the language at issue. See General Statutes (1902 Rev.) § 720.

of terms in the statute itself, [w]e may presume . . . that the legislature intended [a word] to have its ordinary meaning in the English language, as gleaned from the context of its use. . . . Under such circumstances, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Internal quotation marks omitted.) *Efstathiadis* v. *Holder*, 317 Conn. 482, 488, 119 A.3d 522 (2015); see also General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language"). "[A]lthough dictionaries from the time a statute was enacted are often considered the most persuasive . . . later editions also can be instructive, particularly those from the time when a statute is revised but retains the language at issue." (Internal quotation marks omitted.) *9 Pettipaug, LLC* v. *Planning & Zoning Commission*, 349 Conn. 268, 280, 316 A.3d 318 (2024). The term "written consent" has been a part of § 52-215 and its predecessor provisions since 1902. See General Statutes (1902 Rev.) § 720.[20] Section 52-215 was most recently revised in 1982 by No. 82-160, § 104, of the 1982 Public Acts, and that revision retained the language regarding written consent. Accordingly, we look to dictionary definitions from that time.

Webster's New Collegiate Dictionary contemporaneously defined the term "consent," when used as a noun, to mean "compliance in or approval of what is done or proposed by another: acquiescence," or "agreement as to action or opinion." Webster's New Collegiate Dictionary (1981) p. 239. Similarly, Black's Law Dictionary defined "consent," in relevant part, as "[a] concurrence

---

[20] Notably, the predecessor provisions of § 52-215 provided that a case may be entered on the jury docket, at any time, by consent of the parties—without requiring *written* consent of the parties—dating back to 1855. See Public Acts 1855, c. XXVI, § 28; see also General Statutes (1866 Rev.) tit. 1, c. IX, § 127.

of wills. Voluntarily yielding the will to the proposition of another; acquiescence or compliance therewith." Black's Law Dictionary (5th Ed. 1979) p. 276.

In *Efstathiadis* v. *Holder*, supra, 317 Conn. 488–89, our Supreme Court sought to define the term "consent" in connection with the phrase "without such other person's consent," as used in General Statutes § 53a-73a (a) (2), the statute criminalizing sexual assault in the fourth degree. Also turning to dictionary definitions for guidance in that case, our Supreme Court explained: "The term 'consent' is defined with substantial similarity in numerous sources. Webster's Third New International Dictionary (2002) defines consent as a 'capable, deliberate and voluntary agreement to or concurrence in some act or purpose implying physical and mental power and free action . . . .' The American Heritage Dictionary of the English Language (3d Ed. 1992) similarly defines 'consent' as the voluntary '[a]cceptance or approval of what is planned or done by another . . . .' "

With these definitions in mind, and in the exercise of our plenary review over the interpretation of pleadings,[21] we are persuaded that Barr's filing of the jury claim in the Barr action, along with the FIH parties' prompt filing of the certificate of closed pleadings in that action, indicating that the matter would be tried by a jury, constituted written consent by all parties to enter the case on the jury docket in accordance with § 52-215.

In concluding that the parties did not provide written consent to a jury trial in the Barr action by way of these pleadings, the trial court stated that "[Barr] . . . completely ignores the fact that he filed a claim for jury trial on the very same day, and the certificate of closed

---

[21] "[T]he interpretation of pleadings . . . always presents a question of law subject to our plenary review." *Rutherford* v. *Slagle*, 352 Conn. 27, 48, 334 A.3d 988 (2025).

pleadings accurately reflects that filing." We are convinced, however, that the timing of the parties' filings supports, rather than undermines, Barr's argument that the FIH parties consented to a jury trial. After Barr filed his jury claim, the FIH parties did not file an objection, a motion to strike, or otherwise express opposition to a jury trial. Instead, they filed the certificate of closed pleadings, in which their experienced counsel checked off the box indicating that the matter would proceed as a jury trial.[22] In so doing, the FIH parties expressed, at the very least, their acquiescence in, agreement with, or approval of Barr's claim for a jury trial.

Moreover, FIH's filing of its own jury claim in the FIH action, which had been consolidated with the Barr action for trial, further expressed its consent, in writing, to having the two cases tried together by a jury. Although the Barr parties did not file a jury claim of their own in the FIH action, they did not file a motion to strike FIH's jury claim. Indeed, the parties' filings of the jury claim and certificate of closed pleadings in the Barr action essentially reflected their consent to proceed to a jury trial in the FIH action as well because the parties already had agreed to consolidate the two cases with one another for purposes of trial.

In reaching a contrary conclusion—that the parties did not provide written consent to a jury trial—the trial court improperly focused on the timing of the parties' jury claims. For instance, the court stated that it considered that the cases were consolidated and that jury claims had been filed by the parties in both actions but stated that they were "*untimely* requests for a jury case

---

[22] The certificate of closed pleadings contains a section that states: "The pleadings being closed, the case will proceed as a(n): *(Select all that apply)*." The form lists as options: "Jury Trial"; "Hearing in Damages to the Court"; "Hearing in Damages to the Jury"; "Administrative Appeal"; "Non-Jury Matter *(court trial)*." The form displays a box next to each option, and counsel for the FIH parties marked an "x" in the box next to "Jury Trial."

in violation of [§ 52-215] . . . ." (Emphasis added.) The timing of the parties' unilateral jury claims, however, is not pertinent to the question of whether the parties provided written consent to a jury trial by virtue of those jury claims pursuant to § 52-215, because that provision provides that "[a] case may *at any time* be entered in the docket as a jury case by the clerk, upon written consent of all parties . . . ." (Emphasis added.) Whereas a party's right to file a jury claim, and thus unilaterally to insist upon a trial by jury, is in fact time limited, its right to place a case on the jury list upon written consent of all parties may be exercised at any time, including, logically, at any time after the initial deadline for the filing of a unilateral jury claim has passed. Naturally, there would be no need to place a case on the jury list by the consent of the parties if the party had already claimed the case for a jury trial before the statutory deadline.

In their appellate brief, the FIH parties contend that the parties' filings were insufficient to reflect their written consent to a jury trial for a number of reasons, including that their "passing references" to a jury trial instead only reflected their "misapprehension" or "mistaken belief" that Barr's jury claim had been timely filed. The FIH parties, like the trial court, focus on the timing of the jury claims. They argue that, because Barr's jury claim was untimely, they had a vested right to a bench trial, and " 'written consent' to the waiver of a vested right . . . is legally operative only when the consenting party is aware of the rights thereby relinquished." They further argue that "a consenting party must be aware that it has a right to refuse rather than proceeding on the mistaken belief that agreement is the only option," and, in the present case, they were unaware that they had a vested right to a bench trial until the February 8, 2023 trial management conference

when the trial court pointed out that both parties' jury claims were untimely filed.[23] We are not persuaded.

As an initial matter, the FIH parties cannot prevail on their claim because, contrary to their argument, the parties' jury claims and the certificate of closed pleadings—which, as explained previously, explicitly indicated that the matter was to proceed as a jury trial—did not contain mere "passing references" to a jury trial. The parties' other filings, which reference jury selection and note that the actions had been "claimed for jury trial," are consistent with and confirmative of the consent of both parties to try these cases on a consolidated basis before a jury.

Moreover, we are not persuaded that a professed "misapprehension" on the part of the FIH parties' counsel can invalidate their consent to a jury trial.[24] Not only does a lawyer's mistake as to the facts material to advice given to a client not relieve the client of the consequences of following that advice, but the lawyers' claimed mistake in this case—as to the timeliness of the Barr parties' jury claim—was not in fact material to his clients' right not to consent to placing these cases on the jury list.

In addition, the FIH parties' focus, in their argument, on their right to a bench trial and the attendant waiver

---

[23] The FIH parties also suggest that the Barr parties never obtained their consent to a jury trial because "[the Barr parties] never asked FIH to sign a form indicating its consent to a jury trial, and the parties never submitted a joint written statement of consent to a jury trial to the clerk." Section 52-215, however, does not reference any particular form for the parties to sign to express their consent to a jury trial, nor does that provision require such consent to be submitted as a joint filing.

[24] In the FIH parties' appellate brief, they argue that "FIH's counsel proceeded to file a certificate of closed pleadings and jury claim form based on the misapprehension that Barr's jury claim was timely and the belief that FIH's case needed to be filed as a jury case because it was consolidated for trial with Barr's case. . . . If FIH's counsel had appreciated that Barr's jury claim in Barr's case was untimely, however, FIH would never have filed the jury claim in FIH's case."

of that right is misplaced. Significantly, § 52-215 does not contain any language requiring a party to expressly waive its right to a bench trial in order to provide written consent to a jury trial. In *Palumbo* v. *Barbadimos*, supra, 163 Conn. App. 119, this court discussed the circumstances under which a party obtains the right to a bench trial. In *Palumbo*, however, this court did not discuss the waiver of that right, and that case did not involve a claim that the parties had provided written consent to a jury trial. Instead, *Palumbo* focused on what actions the plaintiff was permitted to take *unilaterally* once she failed to file a jury claim pursuant to the statutory deadlines set forth in § 52-215. This court explained: "Having failed to comply with either of the time periods set out in § 52-215, the plaintiff waived her right to *unilaterally* claim her original action to the jury docket. . . . At that time, the defendant acquired the right to have the parties' dispute decided by the trial court. Although that right was subject to divestment by the trial court should it choose to exercise its own discretion to order a jury trial, the decision to do so was outside the control of the plaintiff and was never requested in this case. It is reasonable to infer from the defendant's choice not to exercise his own right to claim the matter to the jury docket that he perceived some advantage to proceeding with a bench trial and that a divestment of that right by the plaintiff's actions would prejudice him." (Citation omitted; emphasis added.) Id., 118–19; see also id., 119 ("the defendant had acquired a right to a bench trial that could no longer be divested *unilaterally* by the plaintiff" (emphasis added)).

Moreover, the cases cited by the FIH parties that discuss consent in a variety of different contexts—primarily criminal cases—are distinguishable from the present case. Many of the cases involve the validity of consent to a search conducted by the police. See *State*

v. *Jenkins*, 298 Conn. 209, 214, 3 A.3d 806 (2010) (defendant provided consent to search his vehicle); *State* v. *Brunetti*, 279 Conn. 39, 45, 901 A.2d 1 (2006) (defendant's father provided consent to search his home, where defendant also resided), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007); *State* v. *Martinez*, 49 Conn. App. 738, 740–43, 718 A.2d 22 (defendant's wife provided consent to search apartment she shared with defendant), cert. denied, 247 Conn. 934, 719 A.2d 1175 (1998); *State* v. *Vaught*, Docket Nos. CR-11-264263-S and CR-11-266931T, 2013 WL 1715703, *3 (Conn. Super. April 2, 2013) (defendant provided consent to search his residence), aff'd, 157 Conn. App. 101, 115 A.3d 64 (2015). Consent provided in such circumstances, therefore, gives rise to concerns that are not present here. For instance, because those cases involve interactions between police officers and members of the general public, a concern may be raised about whether the consent provided is the product of improper police coercion. See, e.g., *State* v. *Jenkins*, supra, 251; *State* v. *Brunetti*, supra, 71; *State* v. *Martinez*, supra, 745. Moreover, providing consent to a search has constitutional implications under the fourth amendment to the federal constitution and article first, § 7, of the state constitution. See, e.g., *State* v. *Jenkins*, supra, 249 ("[a] warrantless search is not unreasonable under either the fourth amendment to the constitution of the United States or article first, § 7, of the constitution of Connecticut if a person with authority to do so has freely consented to the search" (internal quotation marks omitted)). In the present case, by contrast, the issue of consent involves filings by an experienced attorney regarding a matter of trial strategy.

Apart from the significant differences in the circumstances and implications of consent provided in those cases, they also do not support the FIH parties' arguments. First, to the extent that the FIH parties argue

that these cases impose an obligation for a party to be advised of its right to refuse to consent, they are incorrect. In *Brunetti*, *Martinez*, and *Vaught*, although the parties who provided consent to a search were advised of their right to refuse to consent, that fact was not dispositive of the court's conclusion that consent was voluntarily provided. See *State* v. *Brunetti*, supra, 279 Conn. 71; *State* v. *Martinez*, supra, 49 Conn. App. 742, 745; *State* v. *Vaught*, supra, 2013 WL 1715703, *4.[25] Indeed, our Supreme Court has explained: "[W]hile the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." (Internal quotation marks omitted.) *State* v. *Jenkins*, supra, 298 Conn. 251; see also *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 248–49, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973) ("[v]oluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent").

In addition, the FIH parties suggest in their appellate brief that they had only acquiesced to a jury trial, which they argue was insufficient to constitute consent. Specifically, they argue that "[w]ritten consent entailing a waiver of rights must . . . be active and explicit, as opposed to mere acquiescence—a specific form of consent that entails only passivity or lack of protest." (Emphasis omitted; internal quotation marks omitted.) In support of this contention, the FIH parties rely on

---

[25] On appeal in *Vaught*, this court concluded that the trial court had properly found that the defendant voluntarily consented to a search of his residence. See *State* v. *Vaught*, 157 Conn. App. 101, 105, 118–19, 115 A.3d 64 (2015). Significantly, though, in reaching that conclusion, this court did not even mention that the consent form advised the defendant of his right to refuse to consent to a search. See id., 119.

*State* v. *Devalda*, 306 Conn. 494, 508, 50 A.3d 882 (2012), and *State* v. *Morrison*, Docket No. CR-07-0229487-S, 2009 WL 2357478, *5 (Conn. Super. June 16, 2009). In *Devalda*, however, the court's instructional error concerning the defendant's kidnapping charge was based on the clear language of General Statutes § 53a-91 (1) (B), which permits acquiescence of a victim to satisfy the statute's restraint element only in certain limited circumstances. See *State* v. *Devalda*, supra, 507 ("[the] court omitted the clear language of § 53a-91 (1) (B), which permits restraint to occur by acquiescence of a victim only when that victim 'is a child less than sixteen years old or an incompetent person' " (emphasis omitted)). In the present case, § 52-215 does not address acquiescence or include any such limiting language. The FIH parties' reliance on *Morrison* similarly is misplaced. In that case, the court held that "[c]onsent is not established by mere acquiescence *to police authority*." (Emphasis added.) *State* v. *Morrison*, supra, 2009 WL 2357478, *4; see *State* v. *Jenkins*, supra, 298 Conn. 249–50 ("[t]he state must affirmatively establish that the consent was voluntary; mere acquiescence *to a claim of lawful authority* is not enough to meet the state's burden" (emphasis added; internal quotation marks omitted)); see also *Bumper* v. *North Carolina*, 391 U.S. 543, 548–49, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968) ("When a prosecutor seeks to rely [on] consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." (Footnote omitted.)). As already stated, the present case does not involve any concerns related to police authority. Finally, and significantly, the consent in the present case did not entail "only passivity or lack of protest," as the FIH parties suggest. (Internal quotation marks omitted.) This was not a case in which the FIH

parties simply failed to object to Barr's jury claim; rather, as explained previously in this opinion, they took affirmative actions to consent to a jury trial by filing the certificate of closed pleadings in the Barr action and by filing their own jury claim in the FIH action. Accordingly, these consolidated cases were properly entered on the jury docket after all parties provided written consent to do so pursuant to § 52-215.

## II

Having concluded that these consolidated actions properly were entered on the docket as a jury case after all parties provided written consent to so do under the third prong of § 52-215, we must next address whether the FIH parties were entitled to withdraw their consent to a jury trial unilaterally, and if so, whether the court had the authority to erase this case from the jury docket on the basis of such unilateral withdrawal of consent.

In the present case, although the trial court did not characterize the parties' filings as written consent, it acknowledged that the jury claim filed by FIH in the FIH action "means the agreement to a jury trial in that case," and it considered the issue of withdrawal in that context. Then, however, without citation to legal authority, the court ruled that FIH's agreement to trial by jury had become inoperative due to its unilateral withdrawal of its jury claim, which it justified by holding that "[a] party is free to change [its] position and withdraw its claim for a jury trial at any time, even shortly before trial."

As for a consenting party's claimed right to change its mind and withdraw its consent to jury trial unilaterally—at any time, for any reason, as long as its opponent is not prejudiced by erasing the case from the jury docket—the Barr parties disagree, noting that nothing in the statute authorizes such a unilateral change in

tactics, and with it the unilateral denial of its opponent's right to a trial by jury. We agree with the Barr parties.

The FIH parties have cited no authority, and we have found none, to support the proposition that an action properly entered on the jury docket by written consent of the parties may be removed from that docket at the discretion of the court, or upon a party's unilateral withdrawal of consent, at any time. Section 52-215 sets forth the four different ways in which a case may be entered on the docket as a jury case and then specifically states that "[a]ll issues of fact in any such case *shall* be tried by the jury, provided the issues agreed by the parties to be tried by the court may be so tried." (Emphasis added.) Our Supreme Court has explained that, "[i]n interpreting statutory text, this court has often stated that the use of the word shall, though significant, does not invariably create a mandatory duty. . . . The usual rule, however, is that [t]he . . . use of the word shall generally evidences an intent that the statute be interpreted as mandatory." (Internal quotation marks omitted.) *1st Alliance Lending, LLC* v. *Dept. of Banking*, 342 Conn. 273, 282, 269 A.3d 764 (2022); see also *State* v. *Reddy*, 135 Conn. App. 65, 73, 42 A.3d 406 (2012) ("the use of the word 'shall' in the statutes generally suggests a mandatory obligation"). Therefore, although not dispositive, the use of the term "shall" in § 52-215 supports our conclusion that, in the absence of some material legal error in placing the case on the jury list in the first place, such as the lack of written consent by all parties or proof that the purported consent of any party was the product of coercion or was obtained involuntarily,[26] the placement of a case on the jury list upon written consent of all parties fixes each such party's right to a jury trial and prevents the court

[26] Although there may be other circumstances that necessitate removal of an action from the jury docket even without the consent of all parties, we have no occasion to consider that question in the present case.

from erasing the case from the jury docket except by the mutual agreement of all parties. See General Statutes § 52-215 ("[a]ll issues of fact in any such case *shall* be tried by the jury, provided the issues *agreed by the parties* to be tried by the court may be so tried" (emphasis added)). In other words, once the parties provide written consent to a jury trial and the case is properly placed on the jury list, no party retains the unilateral power to withdraw the case from the jury list thereafter. Although § 52-215 grants the court authority to exercise its discretion to order a jury trial; see *Palumbo* v. *Barbadimos*, supra, 163 Conn. App. 119; see also *Falk* v. *Schuster*, supra, 171 Conn. 8; the statute grants the trial court no authority to order a court trial once the case has been placed on the jury docket. See General Statutes § 52-215.

Accordingly, we agree with the Barr parties that the case was properly placed on the jury docket upon written consent of the parties and that the trial court erred in concluding that the FIH parties retained the right to withdraw their consent unilaterally once the case was properly placed on that docket.

The judgments are reversed and the cases are remanded for a new trial before a jury.

In this opinion the other judges concurred.